Sol J. HAZAN, Appellant,

v.

Hershel W. GOBER, Acting Secretary of Veterans Affairs, Appellee.

No. 94–557.

United States Court of Veterans Appeals.

Nov. 14, 1997.

William G. Smith, Los Angeles, CA, was on the pleadings for the appellant.

Mary Lou Keener, General Counsel; Ron Garvin, Assistant General Counsel; R. Randall Campbell, Deputy Assistant General Counsel; and Peter M. Donawick, Washington, DC, were on the pleadings for the appellee.

Before: KRAMER, HOLDAWAY, and STEINBERG, Judges.

STEINBERG, Judge, filed the opinion of the Court. HOLDAWAY, Judge, filed an opinion concurring in part and dissenting in part.

STEINBERG, Judge:

The appellant, veteran Sol J. Hazan, appeals a March 25, 1994, decision of the Board of Veterans' Appeals (BVA or Board) that denied both an earlier effective date for ser-

vice connection for cervical disc disease (CDD) and an earlier effective date for an increased rating for CDD. Record (R.) at 10–11. The decision also concluded that the increase to a 60% disability rating for service-connected congestive heart failure assigned by an August 1993 Department of Veterans Affairs (VA) regional office (RO) decision had granted the appellant's claim in full and that that claim was thus not for appellate review. R. at 7. For the reasons that follow, the Court will affirm the BVA decision in part and vacate the decision in part and remand two matters.

## I. Background

The appellant is a combat veteran of World War II with three separate periods of active duty: with the U.S. Army from May 1944 to June 1946, with the U.S. Navy from June 1955 to September 1956, and again with the U.S. Army from June 1976 to July 1978. R. at 18, 19, 271. Prior to his third period of service, he became a physician, and his discharge from the third period of service records his specialty as psychiatry (R. at 271), although he has testified under oath that during his third period of service he served more as a general practitioner and clinic administrator (R. at 314).

Service medical records from his first and second periods of service indicate no conditions relevant to the instant appeal. However, pre-induction medical examinations in February and March 1976 found no evidence of organic heart disease and, although noting laminectomies in 1959 and 1964 at C4–5 and C–8 with resulting weakness and atrophy, found him fit for duty. R. at 178–80. He has testified under oath as follows about the events that led to the "aggravation" of his CDD, which is currently rated at 40% disabling, and his heart condition, currently rated at 60% disabling: When he returned to active duty in 1976, he expected to be assigned as a psychiatrist to an Army drug and alcohol treatment program, but he was instead assigned to a clinic where he functioned as a general practitioner; he was ultimately assigned as commander of the clinic; because it was in disrepair, he and the personnel assigned to his command engaged in renovation and painting of the clinic; and he thereafter

began to notice shortness of breath and pain in his back and neck. *See* R. at 313–16, 364–66. In March 1977, he sought treatment for worsening back and neck pain, and a physical profile record from the U.S. Army Hospital in Nuernberg listed his "defects" as "[d]egenerative disk disease of cervical spine" and "intrinsic atrophy left hand—residual from acute disk protrusion C7–T1, C4–C5." R. at 183. An Army radiographic report from the same month notes the following impression: "Degenerative, post surgical and chronic traumatic changes to the cervical spine as described above." R. at 235. A fragmentary radiographic report requested in March 1977 explained:

> The C–5 vertebra shows some compression anteriorly and superiorly and reversal of the normal curvature of the c-spine at this region posteriorly. C–7 shows degenerative change both superiorly and inferiorly in the end plates[,] and T–1 shows marked anterior degenerative spurring. Although poorly visualized[,] the T–2 vertebra is probably involved in the degenerative change.

R. at 175. He was put on restricted duty in March 1977, with no overhead lifting and no lifting of objects over 20 pounds. *See* R. at 186, 207. Additionally, a March 1978 report of cardiac catheterization noted that he had been experiencing edema in July 1977 and that symptoms "compatible with left ventricular failure [had] responded to treatment with digoxin and diuretics on two occasions"; the examination found no evidence of left ventricular dysfunction. R. at 198–201. The veteran's June 1978 separation medical examination noted heart and upper and lower extremity abnormalities and summarized the "defects" as "mild congestive cardiac failure" and wasting of the muscles of the left hand. R. at 210–11.

In February 1979, he filed an application with an RO for VA service-connected disability compensation or non-service connected pension based on, inter alia, cardiomyopathy with congestive heart failure and aggravation of CDD. R. at 275. A June 1979 RO decision granted a 30% rating for service-connected congestive heart failure, effective on July 15, 1978, and concluded that CDD and related muscle atrophy were not service connected. R. at 285. Upon appeal of the CDD issue,

the BVA remanded that claim to the RO in July 1980 for a medical examination "by a specialist in orthopedic surgery and neurology in order to determine the nature and extent of spinal disability present." R. at 327.

On remand, VA examinations were conducted by a neurologist (R. at 338–39) and by a specialist in "Rehabilitation Medicine", because the examining office did not have a board-certified orthopedic surgeon on staff for compensation and pension examinations (*see* R. at 395). A December 1980 RO decision on remand continued the denial of service connection for CDD, noting that, although the new examinations had "fully describe[d]" the disability related to CDD, "no[ ] data provided by the exam report has any bearing on the question of service aggravation." R. at 341. The veteran objected to his having been examined by a neurologist and a "physical medicine specialist" because he believed that examinations by "an orthopedist or neurosurgeon [were] properly indicated" and were called for by the BVA remand instructions. R. at 349. In June 1981, the BVA denied service connection for aggravation of CDD. R. at 392.

Subsequently, a February 1983 VA radiographic report, which compared new x-rays to those taken of the veteran in March 1977 while in service, found "very minimal" change, explaining: "Exam essentially the same with mild DJD [degenerative joint disease] changes [ ] (esp[ecially] at T1–C7)." R. at 359. Thereafter, in May 1987, the veteran attempted to reopen as to his claim for CDD, asking to be profiled by an orthopedic surgeon. R. at 397–98. In a September 1987 RO hearing, the veteran testified under oath as to the connection between his work renovating the clinic and the development of neck pain. R. at 364–66. He also argued that, because the 1983 radiographic report had shown no significant change from 1977 (R. at 359) and had resulted in a recommendation that he not be returned to active duty (R. at 361), and because in 1976 he had been found fit to serve, the records plainly showed aggravation of his condition. R. at 374–75. A December 1987 RO decision found that the

hearing testimony did not establish a new factual basis for reconsideration. R. at 409.

In December 1987, the veteran submitted x-rays taken in 1971 and the accompanying report, which reflect his condition subsequent to surgery and five years prior to his third service period. R. at 411. The report noted "[s]econdary evidence of disc disease at the 5th, 6th and 7th cervical and 1st thoracic interspaces" and found "no evidence of any arthritic disease." R. at 412. A December 1987 RO decision granted service connection effective on May 15, 1987, for postoperative CDD, rated at 20% disabling, based upon the new evidence and the fact that the veteran's 1975 examination for return to active duty had found no disability. R. at 417–18. It also deferred a possible CDD increased rating pending a medical examination. R. at 418. After additional VA medical examinations (R. at 422–28), the RO in March 1988 confirmed the 20% CDD rating (R. at 536). The veteran appealed to the Board, arguing that medical examinations should be made by specialists. R. at 552. In an August 1989 BVA hearing, he again objected to VA's failure to supply an examination by an orthopedic specialist, asserted that the examinations he was given were inadequate, and described the extent of his left-arm disability. Supplemental (Suppl.) R. at 4. A March 1990 BVA decision found no evidence of more than the moderate CDD disability required for a rating greater than 20%. R. at 450–51.

In May 1990, the veteran again sought an increased rating for CDD and congestive heart failure. *See* R. at 485. He submitted with his application the report of an extensive medical examination by Dr. Kucera, a private orthopedic specialist, in April 1990 that recorded complaints of headaches, neck pain and stiffness, and low back pain. R. at 454; *see* R. at 493. The examination found "tenderness in the left trapezius area with tightness; 80% range of motion with slight discomfort on extremes of motion" (R. at 454); "moderate clawing" and "moderate to severe weakness" in the left hand (R. at 455); lumbar motion at 80% with "slight discomfort on extremes of motion with hyperextension only" (*ibid.*); and decreased sensation in the left hand and left lateral calf (*ibid.*). Dr. Kucera's report explained that the veteran's

"condition is permanent and stationary" and concluded:

> The patient's disability in the cervical and lumbar spine is compatible with moderate to severe symptoms with recurrent attacks, moderate loss of cervical motion, pronounced symptomatology of intervertebral disc syndrome with persistent symptoms compatible with sciatic neuropathy and with radiculopathy in the upper extremity, neurological findings in the cervical and lumbar spine compatible with the characteristics of pain and neurological findings, appropriate to the level of disc involvement. The postoperative cervical disc disease would be rated at the level of severe.
>
> The patient is in need of ongoing and periodic orthopedic treatment on a maintenance level for the indefinite future. He is very restricted in his physical activities, is disabled, and has not been able to work since 1978.

R. at 458.

A June 1990 VA neurological examination diagnosed: "Marked cervical spondylosis with degenerative pathology in C4–C5, C5–C6, C6–C7, and a residual radiculopathy mainly affecting C5 and C6 on the left. Increased pain since the last evaluation 2 years ago while the reduced function of the left hand has remained unchanged." R. at 469. A VA orthopedic examination in July 1990 concluded:

> [The veteran] has residuals of chronic degenerative disc disease in the cervical spine with residual T1 nerve root deficit on the left and chronic redicular [sic] pain. He has severe permanent intrinsic muscle atrophy of the left hand, very weak grasp strength and poor fine motor function. He is primarily a right[-]handed person. He also has moderate degenerative disc disease in the lumbar spine with a[n] occasional mechanical back pain.

R. at 472. Based on this report, a November 1990 RO decision increased the veteran's rating for CDD to 40%, effective in April 1990, the date of Dr. Kucera's examination, and denied an increased rating for the veteran's congestive heart failure. R. at 485–86. The veteran filed a Notice of Disagreement

(NOD) in March 1991, arguing that new coronary artery disease had been demonstrated and that the effective date for cervical disc disease should have been November 1979 because that is when he was originally referred by the Board for an examination by a specialist in orthopedics. R. at 488–89. In his appeal to the Board, he claimed "clear and unmistakable error" (CUE) in having been denied an examination by a specialist in orthopedics pursuant to the BVA remand in 1980. R. at 502.

At a hearing before the BVA in February 1992, the veteran testified under oath that he had given up volunteer work on flood control projects because the "dissension" produced attacks of angina and that stress and exercise produced angina attacks. R. at 513–14. A BVA decision in June 1992 held in abeyance the claim for an earlier effective date for CDD (R. at 526) and remanded the veteran's heart claim, ordering the RO to secure treatment records generated since 1981, especially records of treatment of a heart disorder since 1990 (R. at 526–27).

Medical progress notes and other medical records were submitted on remand, and an August 1993 RO decision found that the veteran's service-connected heart disease had worsened and granted a 60% rating, effective on May 31, 1990, the date of his claim for an increased rating for that condition. R. at 731. On the September 1993 certification of his appeal to the BVA, the RO certifying official apparently crossed out the claim for congestive heart failure and noted, "granted by rating dated 8/5/93". R. at 736. In an October 3, 1993, letter to the BVA, the veteran noted that the 1992 BVA decision had remanded the heart-condition issue and left unaddressed the two issues of earlier effective date for a 40% rating for service-connected CDD and for an earlier service-connection award for CDD; he wrote: "In August 1993, the first issue was resolved by the local VA[RO] office and that file returned to the BVA for the decision on the remaining two issues.... In view of the delay experienced with the local decision, I trust that the BVA will resolve the *remaining issues* with a timely priority...." R. at 738 (emphasis added). However, a written submission by the veteran's representative in November 1993 identified as at issue the claim for increased evaluation for congestive heart failure, the claim for earlier service connection of CDD, and the claim for an earlier effective date for the 40% rating for CDD. R. at 742.

In the March 1994 BVA decision here on appeal, the Board stated that the veteran's March 1991 NOD, which had expressed disagreement with the RO rating for congestive heart failure, presented an issue "not for appellate review, as the claim was granted by an August 1993[RO] rating decision." R. at 7. The Board noted that the BVA's 1981 decision had been a final disallowance of the claim. R. at 8. The BVA also found "no defect" in the effective date of April 27, 1990, provided for the assignment of a 40% rating for CDD because "the medical records [ ] make it clear that there was a factual basis on which to award a 40 percent rating only as of April 27, 1990." R. at 11. A timely appeal to this Court followed.

## II. Analysis

The appellant has not addressed the effective date of service connection for CDD, and the Court will consider that claim to have been abandoned as part of this appeal and will not address it. *See Degmetich v. Brown,* 8 Vet.App. 208, 209 (1995), *aff'd,* 104 F.3d 1328 (Fed.Cir.1997); *Bucklinger v. Brown,* 5 Vet.App. 435, 436 (1993). Additionally, as to a claim first raised in the appellant's brief—that the BVA decision failed to address a reasonably raised claim for total disability on the basis of individual unemployability (TDIU)—the Secretary has proposed that the TDIU claim be remanded (*see* Secretary's Brief (Br.) at 8–9), the appellant has agreed (*see* Reply Br. at 1), and the issue has since been the subject of June 30, 1995, RO decision granting TDIU (*see* Secretary's June 12, 1996, Notice subsequent to BVA decision on appeal). However, the Court cannot remand a matter over which it has no jurisdiction, which requires a document that can properly be construed as an NOD expressing disagreement with an RO decision on the TDIU claim reasonably raised by Dr. Kucera's April 1990 examination report (R. at 458) or an RO failure to adjudicate that claim. *See* Veterans' Judicial Review Act, Pub.L. No. 100–687 § 402, 102 Stat. 4105,

4122 (1988) (found at 38 U.S.C. § 7251 note); *Slater v. Brown,* 9 Vet.App. 240, 244–45 (1996); *Isenbart v. Brown,* 7 Vet.App. 537, 540–41 (1995); *Johnston v. Brown,* 10 Vet. App. 80, 89–91 (1997) (Steinberg, J., concurring). Here, the NOD filed in March 1991 as to the November 1990 RO decision cannot be construed as disagreeing with an RO decision's not adjudicating the TDIU claim reasonably raised by Dr. Kucera's testimony. Hence, the RO's failure to adjudicate that TDIU claim was not properly appealed to the BVA and thus is not before the Court.. *See Isenbart, supra.* That reasonably raised TDIU claim was apparently the one adjudicated and awarded by the RO in June 1995.

Thus, this appeal presents two major issues: (1) Whether the Board erred in the effective date it assigned for the veteran's increased rating for CDD; and (2) whether the Board erred in determining that his claim for an increased rating for congestive heart failure was not properly before the Board. In order to assist it in the resolution of the first issue, the Court, on October 10, 1996, ordered supplemental briefing, and both parties have filed supplemental memoranda.

### A. Earlier Effective Date for CDD Increased Rating

The appellant contends that he is entitled to an earlier effective date for his 40% CDD rating. He argues that, because his May 31, 1990, claim led to the 40% rating (R. at 485), section 5110(b)(2) of title 38, U.S.Code, requires an earlier effective date (within the year preceding May 31, 1990) where one can be ascertained, and that such an earlier date can be ascertained on the basis of his own August 1989 sworn hearing testimony (Suppl. R. at 1–11); he contends that that testimony was not considered by the 1994 Board decision presently on appeal (Reply Br. at 4–5). He also argues that 38 U.S.C. § 7103(c) requires the BVA to reconsider the "obvious error" involved in its failing to account for his 1989 hearing testimony in determining the effective date for his increased rating for CDD.

The Secretary addresses the issue of the use of the 1989 hearing testimony to establish an increased-rating effective date as a question of CUE, arguing that the 1989 hearing testimony cannot be used to establish an effective date prior to the March 1990 BVA decision that had concluded that he had not satisfied the criteria for an increased rating. R. at 450–51. The Secretary argues that the BVA properly addressed the issue of obvious error. Br. at 14. The Court will consider the two issues separately.

### 1. Effective Date for CDD under 38 U.S.C. § 5110(b)(2)

The appellant asserts that the 1994 BVA decision denying an effective date earlier than April 27, 1990, for the 40% CDD rating failed to take proper account of 38 U.S.C. § 5110(b)(2). Subsections (a) and (b) of section 5110 provide:

(a) Unless specifically provided otherwise in this chapter, the effective date of an award based on an original claim, a claim reopened after final adjudication, or a claim for increase, of compensation, dependency and indemnity compensation, or pension, shall be fixed in accordance with the facts found, but shall not be earlier than the date of receipt of application therefor.

(b)(1) . . . .

(2) The effective date of an award of increased compensation shall be the earliest date as of which it is ascertainable that an increase in disability had occurred, if application is received within one year from such a date.

38 U.S.C. § 5110(a), (b); *see also* 38 C.F.R. § 3.400(*o*) (1996). In establishing the effective date for the increased rating, the November 1990 RO decision had relied upon the April 1990 report by Dr. Kucera. R. at 453–58. The appellant contends that his own sworn testimony during the August 1989 hearing (Suppl. R. at 2–12) and prior to the March 1990 BVA decision demonstrated an earlier effective date and that this is evidence that the RO and the Board failed to consider in the proceedings leading to the BVA decision on appeal.

The veteran's August 29, 1989, testimony before a traveling section of the BVA is devoted largely to his admonishing the RO for having failed to provide an examination by a qualified specialist in orthopedic medicine, as was required by the 1980 remand by the Board. Suppl. R. at 2–5. In the course

of his testimony, the veteran also mentions the atrophy in his left arm (Suppl. R. at 4) and the military's determination of his disability and its refusal to restore him to active duty (Suppl. R. at 5–6). The bulk of his testimony about his current condition occurred near the end of the hearing, where he testified as follows, in response to a question as to how his condition affected his activities:

> A. If I'm active, I have to, first of all I don't have the complete use of my left hand and I have atrophy, I have a residual hand. Discomfort at night, it's extensive. I have to use a muscle relaxant. I've been using Ibuprofen[;] if that doesn't help me with my discomfort, then I have my own supply of Empirin/Codeine.... I use Valium as my muscle relaxant most of the time.
>
> I'm sitting at the dinner table for instance and I turn my head and you can hear the crepitus, the joint crepitus—
>
> Q. Is that painful?
>
> A. Yes, very definite.
>
> . . . .
>
> Q. Are you able to work?
>
> A. I think I could work, I'm uncomfortable a great deal of the time and if I'm erect, for instance, if I wear a jacket and tie and I'm out all day, I usually get a lot of spasms in my muscles.
>
> . . . .
>
> Q. Where is the pain you're talking about, neck, hand, shoulder, arm?
>
> A. The neck, primarily the neck and usually when I wake up at night, I may take two showers.

Suppl. R. at 7–8.

### a. Evidence to be reviewed to determine "ascertainable" increase:

The 1994 BVA decision, in assessing the evidence available for ascertaining an increased rating, does not mention the veteran's 1989 hearing testimony. This was an error. On its face, section 5110(b)(2) requires review of all the evidence of record (not just evidence not previously considered) as to the disability in order to "ascertain[ ]" the "earliest" possible effective date. *See Scott (Charles) v. Brown,* 7 Vet.App. 184, 189 (1994) (approving BVA's consideration of "all the evidence of record" for the year preceding claim); *Servello v. Derwinski,* 3 Vet.App. 196, 200 (1992) (although increased rating was based upon evidence submitted subsequent to application for increased rating, Board erred in not considering evidence about status of condition during one-year period prior to application); 38 U.S.C. § 7104(a) (Board decision "shall be based on the entire record in the proceeding and upon consideration of all evidence and material of record"); *cf. Quarles v. Derwinski,* 3 Vet.App. 129, 134–36 (1992) (Board based effective date on November 1984 letter from doctor, but, because November 1984 letter included and was based upon October 1984 examination, and because that examination occurred within one year prior to filing of claim, Board's setting of November, rather than October, 1984 effective date was clearly erroneous); *cf. also Evans v. Brown,* 9 Vet. App. 273, 283 (1996) (in claim to reopen on the basis of new and material evidence, if evidence is "new" and "probative", then VA must determine "in light of *all the evidence of record,* [whether] there [is] a reasonable possibility that the outcome of the claim on the merits would be changed" (emphasis added)). Thus, the BVA was required to consider the 1989 hearing testimony in ascertaining the effective date for the appellant's rating.

The Board is required to provide a written statement of the reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record; the statement must be adequate to enable the claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See* 38 U.S.C. § 7104(d)(1); *Simon v. Derwinski,* 2 Vet. App. 621, 622 (1992); *Masors v. Derwinski,* 2 Vet.App. 181, 188 (1992); *Gilbert v. Derwinski,* 1 Vet.App. 49, 57 (1990). To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence that it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the veteran. *See Caluza v. Brown,* 7 Vet.App. 498, 506 (1995), *aff'd per curiam,* 78 F.3d 604 (Fed.Cir.1996) (table); *Gabrielson v. Brown,* 7 Vet.App. 36, 39–40 (1994); *Abernathy v. Principi,* 3 Vet. App. 461, 465 (1992); *Gilbert, supra.*

**b. Applicability of Smith opinion:** The Secretary identifies the issue surrounding the BVA's nonconsideration of the veteran's 1989 hearing testimony as one of CUE under 38 C.F.R. § 3.105(a) (1996), which provides in pertinent part: "Where evidence establishes [CUE], the prior decision will be reversed or amended. For the purpose of authorizing benefits ... reversal of a prior decision on the grounds of [CUE] has the same effect as if the corrected decision had been made on the date of the reversed decision." He points out that the decision in *Smith (William) v. Brown,* 35 F.3d 1516 (Fed.Cir.1994), "precludes reliance on a claim of [CUE] to collaterally attack a BVA decision" and that the November 1990 RO "finding that a factual basis for a 40% rating was ascertainable at an even earlier date would necessarily constitute a collateral attack on the BVA's decision" in March 1990 because the BVA had there accounted for the 1989 hearing evidence in determining that the veteran did *not* meet the criteria for an increased rating. Br. at 13–14. For his part, the appellant contends that the March 1990 BVA decision—because it denied an increased rating—never had occasion to address the issue of a proper *effective date* for an increased rating and that, therefore, the RO in November 1990 would not be collaterally attacking that final BVA decision if the 1989 hearing testimony were later used to establish the effective date for the increased rating (to 40%) that was awarded for the veteran's CDD by the November 1990 RO decision. The appellant further argues that, because "an increase", within the meaning of section 5110(b)(2), can mean—in essence—"any increase", the Board's 1990 determination that the veteran had not shown an increase to the next disability level does not preclude the RO's finding that, nonetheless, "an increase" was shown ("ascertainable") for the purposes of assigning the effective date of the increased rating.

It is clear that *Smith* precludes a collateral attack by an RO on a final BVA decision and, more broadly, that it precludes the application of CUE provisions to challenge BVA decisions. *See Smith,* 35 F.3d at 1526–27; *see also Duran v. Brown,* 7 Vet.App. 216, 223–24 (1994); *Talbert v. Brown,* 7 Vet.App. 352, 355 (1995). The issue here, however, is whether the appellant's position—not in itself articulated as a claim of CUE in its suggestion that the 1989 hearing evidence be considered to determine an earlier effective date—would necessarily involve an impermissible collateral attack upon the 1990 BVA decision. In order to help resolve this issue, the Court must address the meaning of 38 U.S.C. § 5110(b)(2) to determine whether the issue involved in deciding whether an increase is warranted necessarily subsumes the issue involved in setting the effective date for that increase.

**c. Meaning of "an increase" in section 5110(b)(2):** Upon consideration of the language of section 5110(b)(2) in the context of the entire section, the Court holds that section 5110(b)(2) is clear and unambiguous as to what "an increase" means. When it states that "[t]he earliest effective date of an award of increased compensation shall be the earliest date as of which it is ascertainable that an increase in disability had occurred, if application is received within one year from such date", the only cognizable "increase" for this purpose is one to the next disability level. Section 5110(b)(2) is invoked only where it has been determined that the evidence warrants an increase to the next disability level; because an increase to the next disability level is required to invoke subsection (b)(2), "an increase" is most logically construed in that context to mean an increase to the next disability level.

Adopting the appellant's position in the instant case, to the extent that that position is that Dr. Hazan's testimony alone could show an increase to the next disability level, would permit the assignment of an effective date for an increased rating as of a point in time when, as a matter of law because of an intervening BVA decision (such as the Board's March 1990 decision here), *an increase had not been demonstrated.* It is true that certain provisions of chapter 51, in assigning effective date, apparently allow a claimant to receive benefits as of a given date *without* a showing of entitlement as of that date. *See, e.g.,* 38 U.S.C. §§ 5110(b)(1) (effective date of disability compensation is date of separation for a veteran who files application within one year after separation);

5110(d)(1) (effective date of dependency and indemnity compensation is first day of month in which death occurred for survivor who files application within one year after veteran's death); 5110(d)(2) (effective date of death pension is first day of month of death for survivor who files application within 45 days after death). However, section 5110(b)(2) specifically links any effective date earlier than the date of application to evidence that "an increase in disability had occurred" and to the receipt of an application within one year after that increase in disability. The application referred to must be an application on the basis of which the increased rating was awarded, *cf. Wright v. Gober*, 10 Vet.App. 343, 346–47 (1997) (although 38 U.S.C. § 5110(b)(1) sets effective date as date of separation for disability for which application is filed within one year after service, that application must lead to service connection and does not preserve date of separation as effective date where claim is denied and then granted only pursuant to a later application), because there would be no reason to adjudicate the question of effective date *prior* to the award of a rating increase, just as there would be no reason to assign a disability rating on a disability-compensation claim until service connection had been awarded. *See Grantham v. Brown*, 114 F.3d 1156, 1158 (Fed.Cir. 1997) ("the . . . first decision [by the agency of original jurisdiction (AOJ)] found that Grantham's condition was not service connected, and therefore the decision never reached the down-stream question concerning compensation level [that is, rating]"); *Barrera v. Gober*, 122 F.3d 1030, 1033 (Fed. Cir.1997) (Plager, J. concurring) (RO decision that granted service connection on remand was "the first time that a disability rating and an effective date had been assigned since a finding of service connection is a predicate for considering percent disability or effective date"); *West (Walter) v. Brown*, 7 Vet.App. 329, 338 (1995) (en banc) (Steinberg and Kramer, JJ., dissenting) ("[w]hen the Board grants service connection, it 'returns' the claims file to the RO for it to determine an effective date and whether or not a compensable rating should be assigned").

Accordingly, absent clear congressional intent to effectuate a grant of benefits to claimants, by way of effective date, at a time when they are not otherwise entitled to such an increase, the Court cannot agree with the appellant that "an increase in disability" means that a claimant, having shown an increase to the next disability level on the basis of certain evidence, then need clear a lower hurdle in establishing the effective date for that increase—that is, that *any* ascertainable increase, no matter how marginal, in disability within the year preceding application would require an earlier effective date. Section 5110(b)(2) provides an exception to the general rule in section 5110(a)—which, "[u]nless specifically provided otherwise in this chapter," precludes the award of an effective date prior to the date of application—insofar as section 5110(b)(2) allows a claimant to be awarded an effective date up to one year prior to the filing of his or her application for an increase if an increase to the next disability level is ascertainable and if a claim is received within one year thereafter.

■ *d. Application of section 5110(b)(2) and foregoing principles to current facts:* In view of the foregoing analysis and because the Board's unappealed final decision in March 1990 is determinative, as a matter of law, that the evidence then before it did not show entitlement to an increased rating, the appellant is collaterally estopped from relitigating the same issue based upon the same evidence, albeit for a different purpose. *See University of Tennessee v. Elliott*, 478 U.S. 788, 797, 106 S.Ct. 3220, 3225, 92 L.Ed.2d 635 (1986) ("[w]e have previously recognized that it is sound policy to apply principles of issue preclusion to the fact-finding of administrative bodies acting in a judicial capacity"); *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 76 n. 1, 104 S.Ct. 892, 894 n. 1, 79 L.Ed.2d 56 (1984) ("[i]ssue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided"); *Strott v. Derwinski*, 1 Vet.App. 114, 117 (1991) (" 'issue and claim preclusion' . . . historically called 'res judicata' . . . means that decisions once made are not subject to reexamination except for compelling reasons"), *aff'd*, 964 F.2d 1124 (Fed. Cir.1992); *cf. Spencer v. Brown*, 4 Vet.App. 283, 289 (1993) ("section 7104(b) does not preclude de novo adjudication of a claim, on

essentially the same facts as a previously and finally denied claim, where an intervening change in law or regulation has created a new basis of entitlement").

■ Therefore, the Board's failure to address the veteran's 1989 hearing testimony in its 1994 decision as to that evidence's providing *the sole basis* for an earlier effective date is nonprejudicial error, *see* 38 U.S.C. § 7261(b); *Edenfield v. Brown*, 8 Vet.App. 384, 390–91 (1995) (en banc), because the Board was collaterally estopped from viewing that evidence any differently from the way it had in 1990, absent a finding that the Board had committed obvious error in its 1990 decision. *See Chisem v. Brown*, 4 Vet.App. 169, 177 (1993) (Board has "discretion to *correct* an 'obvious' error, when one is found" and that discretion is not subject to review in this Court); 38 U.S.C. § 7103(a) (decision of Board is final unless Chairman orders reconsideration), (c) (notwithstanding section 7103(a), Board may correct "obvious error"); part II.A.2, below. To this extent, then, the Secretary is correct that the Board would have been precluded from using the 1989 testimony as, *in and of itself,* evidence of entitlement to a higher rating as of that date. And the RO would have been absolutely barred under collateral estoppel and the *Smith* principles from so using that evidence in a way that would have been inconsistent with the Board's 1990 rejection of the very same evidence on the rating-increase question.

■ However, the Secretary's position is nevertheless fundamentally mistaken insofar as it suggests that the Board (and the RO) *could not properly have* considered the 1989 hearing testimony at all. In point of fact, as the Court's caselaw, section 5110(b)(2), and our discussion in part II.A.1.a., above, demonstrate, VA must review *all the evidence of record (not just evidence not previously considered* ) once a claimant has submitted a well-grounded claim for an increased disability rating. ˙*See Scott* and *Servello,* both *supra; cf. Quarles* and *Evans,* both *supra.* The principle of collateral estoppel forbids relitigation of the same issue on the same facts; however, by definition in an increased-rating case the claim is well grounded because of some new evidence as to an increase in disability—here, Dr. Kucera's examination report. At the time that that report was submitted, the question before the Board was: On the basis of that evidence and all prior evidence, when was an increase in disability "ascertainable"? The Board erred as a matter of law in making that "ascertainable" decision only on the basis of the new evidence. We cannot say what result would have flowed from consideration of all the evidence of record, including the veteran's August 1989 testimony, under section 5110(b)(2) in terms of an effective date earlier than April 1990. For example, the Board might find that the veteran's testimony, especially given that he is a physician, takes on new meaning when viewed in light of the new evidence from Dr. Kucera. The Court wishes to emphasize that, for the reasons stated in part II.A.1.c., above, the veteran's testimony could not alone lead to a grant of an earlier effective date, and that that testimony is relevant upon remand only insofar as it must be part of the entire evidence of record considered in the process of determining when the rating increase was "ascertainable" within the meaning of section 5110(b)(2). Hence, that matter will be remanded in order for the Board to carry out that analysis as to the CDD-effective-date issue and to set forth an adequate statement of reasons or bases under 38 U.S.C. § 7104(d)(1) and *Caluza, Gabrielson, Abernathy,* and *Gilbert,* all *supra,* on that point.

In carrying out this analysis on remand, the Board must determine under the evidence of record the earliest date that the increased rating was "ascertainable" within the meaning of section 5110(b)(2). *See Allen v. Brown,* 7 Vet.App. 439, 446 (1995) (en banc) (adopting Supreme Court's statement in *Brown v. Gardner,* 513 U.S. 115, 118, 115 S.Ct. 552, 555, 130 L.Ed.2d 462 (1994), that "interpretive doubt is to be resolved in the veteran's favor"); *see also Smith,* 35 F.3d at 1523 (rules of statutory construction apply to construction of regulatory provisions). If it was so ascertainable on a date within one year before the date of the veteran's May 1990 application for such a rating increase, the Board should proceed to assign that date as the effective date for the 40% rating. If it was so ascertainable more than one year before the date of the veteran's application,

the Board must determine whether the language "within one year from such a date" in section 5110(b)(2), *see also* 38 C.F.R. § 3.400(*o*)(2), permits or precludes the assignment of an effective date earlier than April 27, 1990, and provide a statement of reasons or bases for any such determination. *See* 38 U.S.C. § 7104(d)(1); *cf.* 38 C.F.R. §§ 3.155(a) (formal claim received within one year after informal claim "will be considered filed as of the date of receipt of the informal claim"); 3.157(b)(2) (date of receipt of report of private examination is date of receipt of informal claim for rating increase); 3.157(a) ("[a]cceptance of a report of examination or treatment as a claim for increase is subject to ... the payment of retroactive benefits from the date of the report or for a period of 1 year prior to the date of receipt of the report") (1996).

### 2. *Allegations of Obvious Error under 38 U.S.C. § 7103(c)*

■ The appellant also contends that 38 U.S.C. § 7103(c) required the BVA in 1994, in light of Dr. Kucera's testimony, to reconsider its previous decisions. Section 7103(c) provided then: "Notwithstanding subsections (a) [stating that a Board decision is final unless the Board Chairman orders reconsideration] and (b) [stating that when the Chairman orders reconsideration the case is to be heard by an expanded section of the Board] of this section, the Board on its own motion may correct an obvious error in the record." 38 U.S.C. § 7103(c). However, by its very terms, section 7103(c) is committed to the discretion of the Board. In *Chisem,* the Court observed that, although the Board has discretion sua sponte to reconsider an issue pursuant to section 7103(c), it "does not have discretion to determine whether it will *consider*" a claim of obvious error actually raised to it by an appellant pursuant to section 7103(c). *Chisem, supra* (remanding for Board's consideration of the obvious-error claim "specifically raised" by appellant); *see also* 38 C.F.R. § 20.1000 (1996).

It is overwhelmingly clear from the record on appeal that the appellant did raise to the Board the issue of alleged errors in prior Board decisions. His 1991 VA Form 1–9 included an allegation of "clear and unmistakable error" based on the RO's failing to provide an examination by an orthopedic spe-

cialist, as per the 1980 BVA remand order (*see* R. at 502); his NOD (*see* R. at 488–89), his BVA hearing testimony in 1992 (R. at 514–15), and the written presentations of his representative to the BVA in 1992 (R. at 521–22) and 1993 (R. at 742–43) also all raise this issue. However, the 1994 BVA decision specifically noted that "the veteran and his representative have used the terms 'error,' and in one instance 'clear and unmistakable error,' in relation to prior Board decisions concerning the adequacy of examinations". The Board, while noting that the veteran had raised the issue of CUE, specifically found that he had not made out a viable CUE claim in his contention that it was CUE for the RO to fail to provide an examination by an orthopedic specialist. R. at 9.

■ A CUE claim and an obvious error claim are essentially equivalent. *See Dinsay v. Brown,* 9 Vet.App. 79, 88 (1996); *see also Smith,* 35 F.3d at 1526; *Russell v. Principi,* 3 Vet.App. 310, 314 (1992) (en banc). The Court has held that "merely to aver that there was CUE in a case is not sufficient to raise the issue ... if it is not absolutely clear that a different result would have ensued". *Fugo v. Brown,* 6 Vet.App. 40, 43–44 (1993). In *Russell v. Principi,* the Court defined CUE as follows:

> Either the correct facts, as they were known at the time, were not before the adjudicator or the statutory or regulatory provisions extant at the time were incorrectly applied.... [CUE] is the sort of error which, had it not been made, would have manifestly changed the outcome ... [, an error that is] undebatable, so that it can be said that reasonable minds could only conclude that the original decision was fatally flawed.

*Russell,* 3 Vet.App. at 313. "In order for there to be a valid claim of [CUE], ... [t]he claimant, in short, must assert more than a disagreement as to how the facts were weighed or evaluated." *Ibid.* The veteran has consistently maintained that, but for the absence of an examination by an orthopedic specialist, he would have been service connected for CDD as of 1979. There is, however, no way of knowing what such an orthopedic examination would have yielded in 1979,

so it could not be concluded that it "would have manifestly changed the outcome", *Russell, supra.* In addition, the Court has held that a failure in the duty to assist cannot constitute CUE. *Caffrey v. Brown,* 6 Vet. App. 377, 383–84 (1994). Accordingly, because the veteran could not, consistent with *Caffrey* and *Russell,* have made out a CUE claim, any insufficiency as to the Board's analysis of an obvious-error claim could not have been prejudicial to the appellant. *See* 38 U.S.C. 7261(b); *Edenfield, supra.* Hence, a remand pursuant to *Chisem* would be a fruitless exercise. *See Soyini v. Derwinski,* 1 Vet.App. 540, 546 (1991) (where evidence is "overwhelmingly" against claim, remand for reasons-or-bases compliance would result in "this Court's unnecessarily imposing additional burdens on the BVA and [ ]VA with no benefit flowing to the veteran").

### B. Abandonment of Heart Claim

██ The appellant also claims that the BVA erred in treating his claim for an increased rating for his heart condition as no longer for appellate review because it was granted by the RO. The appellant's new claim for an increased rating for his heart condition was submitted with his new claim for an increased rating for CDD in May 1990 and was denied in the November 1990 RO decision that granted an increased rating as to the latter claim. R. at 484. In June 1992, the Board remanded the heart claim for the acquisition of additional records related to the veterans' treatment. R. at 526–27. Subsequently, the RO granted an increased rating, from 30% to 60%, in August 1993. R. at 727. *See* 38 C.F.R. § 4.104, Diagnostic Code (DC) 7005 (1996) (providing arteriosclerotic-heart-disease ratings of 30%, 60%, or 100%).

In the RO's certification of appeal, dated September 1993, the increased-rating claim for congestive heart failure is stricken out and there is a notation "granted by rating date 8/5/93", apparently made by the VA certifying official. R. at 736. In a letter to the BVA in October 1993, the veteran incorporated by reference the issues considered in the 1992 docketing of his claim before the BVA. R. at 738. However, his conclusion notes: "In view of the delay experienced with the local decision [RO decision on increased rating for congestive heart failure], I trust

that the BVA will resolve *the remaining issues* with a timely priority...." *Ibid.* (emphasis added). Nevertheless, the statement of the veteran's accredited representative in a November 1993 written submission to the BVA specifically incorporated the heart claim when it referred to the veteran's claim for "increased evaluation" for congestive heart failure. R. at 742. The BVA, in the "Introduction" section of its 1994 decision, concluded, without stating more, that the issue of an increased rating for congestive heart failure "is not for appellate review, as the claim was granted by an August 1993[RO] decision." R. at 2.

The Secretary contends that because "the Appellant and his designated representative explicitly abandoned any claim for a rating in excess of 60% for his heart condition, the BVA was not required to address this issue." Br. at 11. However, in *Verdon v. Brown,* this Court held that *"where it is not clear* that a VA claimant has withdraw a particular claim from an appeal to the BVA, it is not sufficient for the Board to conclude that there is abandonment without providing an adequate statement of reasons or bases to support that conclusion". *Verdon v. Brown,* 8 Vet.App. 529, 533 (1996); *see EF v. Derwinski,* 1 Vet.App. 324, 326 (1991) (requiring liberal construction of claimant's submissions).

The Court concludes that it is not clear that the appellant abandoned his claim to the Board for an increased rating (above 60%) for congestive heart failure. Thus, the Board's summary notation in the Introduction to its decision does not amount to an adequate statement of reasons or bases under 38 U.S.C. § 7104(d)(1). We will thus remand that matter to the Board for an adequate statement of reasons or bases as to the conclusion that it reaches on this matter on remand. *See Verdon, supra.* If, upon further consideration, the BVA concludes that the veteran has not abandoned this claim, it must then consider whether the veteran is entitled to an increased rating for congestive heart failure. *See AB v. Brown,* 6 Vet.App. 35, 38 (1993) ("on a claim for an original or increased rating, the claimant will generally be presumed to be seeking the

maximum benefit allowed by law and regulation, and it follows that such a claim remains in controversy where less than the maximum available benefit is awarded."); *see also Hamilton v. Brown*, 4 Vet.App. 528, 538 (1993) (en banc), *aff'd*, 39 F.3d 1574, 1582–85 (Fed.Cir.1994) (claim remanded by Board remains in appellate status during subsequent RO adjudications).

### C. Fee Agreement

█ Under its authority under 38 U.S.C. § 7263(c), the Court, on its own motion, undertakes a review of the July 7, 1994, fee agreement that the appellant's counsel, William G. Smith, Esquire, has submitted in accordance with that provision. The agreement provides for the payment of a fixed fee of $2000 plus a contingent fee of 20% of past-due benefits awarded, to be paid directly by the Secretary to the attorney. Attachment to Notice of Appearance at 1–2. The Court finds that this provision of the agreement is "unreasonable" on its face and thus unenforceable because it provides for direct payment by the Secretary under a fee agreement that conflicts with section 5904(d)(1) and (2)(a), which permits direct payment by the Secretary as to an agreement falling under that section only when "the total fee payable to the attorney [does] not exceed 20 percent of the total amount of any past-due benefits awarded on the basis of the claim." Any prior ambiguity in the law on this matter was resolved by the November 1994 amendment made to section 5904(d) by section 504 of the Veterans' Benefits Improvements Act of 1994 (VBIA), Pub.L. No. 103–446, § 504, 108 Stat. 4645, 4663–64 (1994). The legislative history establishes conclusively that that amendment was designed to "overrule the Court of Veterans Appeals as to one element of its decision in *Matter of Fee Agreement of Smith*" (*see In re Fee Agreement of Smith in Case Number 91–488* [hereinafter *In re Smith*], 4 Vet.App. 487, 501–02 (1993), *vacated and remanded on other grounds sub nom. Matter of Wick*, 40 F.3d 367 (Fed.Cir.1994)), specifically the holding there that direct VA payment of the attorney fee was permissible "even though the fee agreement ... did not provide for a true contingency fee, but rather a 'hybrid' fee—a partially fixed, partially contingent fee"—because "[a] true contingency fee agreement

does not require payment of any fixed fee." S.Rep. No. 103–232, at 7 (1994) (describing section 4 of S. 1546, which was identical to provision ultimately enacted in Pub.L. No. 103–466); *see also* 140 Cong.Rec. H11,357 (daily ed. Oct. 7, 1994) (Joint Explanatory Statement for H.R. 4386, the VBIA) ("[s]ection 504 follows the Senate bill [section 4 of S. 1546]" by "clarifying that an attorney may receive payment for representation in proceedings before VA or the Court of Veterans Appeals directly from VA out of a retroactive benefit only if the total amount of the fee is contingent upon the claim being resolved in favor of the appellant"); 140 Cong.Rec. $15,007 (daily ed. Oct. 8, 1994) (statement of Sen. Rockefeller, floor manager, to same effect); *compare In re Smith*, 4 Vet.App. at 502 (fee agreement that called for both fixed fee and contingent fee—from which, if awarded, fixed fee was to be deducted—comported with section 5904(d)), *with In re Smith*, 5 Vet.App. 307, 310 (1993) (Steinberg, J., dissenting as to denial of motion for en banc review) (suggesting that section 5904(d) requires that *entire* fee be contingent); *cf. Matter of Vernon*, 8 Vet.App. 457, 459 (1996) (fee agreement calling for contingency fee of 20% comported with section 5904(d)); *Lewis v. Brown*, 5 Vet.App. 151, 154 (1993) (although fee agreement providing for payment of $100 per hour plus 20% contingent fee was not unreasonable on its face, agreement did not call for payment by Secretary pursuant to section 5904(d)).

### III. Conclusion

Upon consideration of the record and the submissions of the parties and in light of the above analysis, the Court affirms the March 25, 1994, BVA decision in part (as to the abandoned claim for an earlier effective date for CDD service connection) and vacates the decision in part and remands two matters—an earlier effective date for a CDD increased rating and an increased rating for congestive heart failure—for expeditious further proceedings in accordance with applicable law and regulation and consistent with this opinion and in accordance with VBIA section 302, 108 Stat. at 4658 (found at 38 U.S.C. § 5101 note) (requiring Secretary to provide for "expeditious treatment" for claims remanded by

BVA or Court). *See Allday v. Brown,* 7 Vet.App. 517, 533–34 (1995). The Court also concludes that the appellant's fee agreement with his attorney is unenforceable as to any direct payment by the Secretary. As to the remanded claims, "the appellant will be free to submit additional evidence and argument". *Quarles,* 3 Vet.App. at 141. A final decision by the Board following the remand herein ordered will constitute a new decision that, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the new Board final decision is mailed to the appellant.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

HOLDAWAY, Judge, concurring in part and dissenting in part:

I agree with the majority opinion except insofar as it remands for a determination of the "earliest ascertainable date that the increased rating was 'ascertainable' within the meaning of section 5110(b)(2)," and potentially requires the Board to "determine whether the language 'within one year from such a date' in 5110(b)(2) . . . permits or precludes the assignment of an effective date earlier than April 27, 1990." Part II.A.1.d, *supra.* By statute the Court is required to "decide all relevant questions of law, interpret constitutional, statutory, and regulatory provisions, and determine the meaning or applicability of the terms of an action of the Secretary." 38 U.S.C. § 7261(a)(1). Yet the majority would have the Board decide issues of statutory interpretation which are more appropriately decided by the Court.

In the context of section 5110(b)(2), the term "earliest ascertainable date" means the date on which sufficient evidence existed to prove that a disability had increased. In *Wood v. Derwinski,* 1 Vet.App. 367 (1991), the Court relied on what is now § 5110(b)(2) to remand for determination of the date an increased disability became ascertainable. The Court then briefly explained how to "ascertain" that date from the evidence. Observing that the Board had received the results of January 1987 examinations in May 1987, the Court suggested that the records "would seem to rather conclusively establish January 1987 as the latest date on which the

extent of appellant's disability was ascertainable." However, the Court observed that there was "also evidence suggesting an earlier date," and the BVA was instructed to consider two earlier reports, dated July 1986 and June 1984, that might indicate that the disability increased by either of those dates. *Id.* at 369.

Although the Court pronounced no formal definition of the word "ascertainable" in its decision, its instructions to the Board assumed that "earliest ascertainable date" meant the date when probative reports were prepared, in other words, the day that sufficient evidence came to exist which could prove a disability had increased. In *Wood, supra,* it meant that the earliest ascertainable date was the date of the earliest examination indicating total and permanent unemployability.

The interpretation of section 5110(b)(2) expressed in *Wood* is supported by the subsection's context. Section 5110(a) outlines the general rule that an effective date must be "fixed in accordance with the facts found." Section 5110(b)(2), an exception to the general rule, uses different words—"the earliest date as of which it is ascertainable that an increase in disability had occurred"—suggesting congressional intent to communicate a different meaning. Therefore, the use of "ascertainable," rather than "facts found," implies that Congress did not mean for a retroactive effective date to be established by looking at the evidence and extrapolating backward based on the facts found therefrom. Instead, the effective date should be the date when sufficient evidence existed to find that the disability had increased.

In applying section 5110(b)(2) to the instant case, the earliest ascertainable date of a disability increase is the date of Dr. Kucera's report, April 1990. The majority opinion shows that Dr. Hazan's testimony in August 1989 was insufficient on its own, or in combination with all previously existing evidence, to prove that Dr. Hazan's disability had increased. *See* part II.A.1, *supra.* Therefore, because no more material evidence came into existence until Dr. Kucera prepared his report in April 1990, the earliest date that an increased disability was ascertainable was

April 1990. Since the Board already awarded an effective date of April 29, 1990, remand to decide the earliest ascertainable date is moot. Accordingly, I respectfully dissent.