﻿Citation Nr: AXXXXXXXX
Decision Date: 08/29/19 Archive Date: 08/29/19

DOCKET NO. 190206-3578
DATE: August 29, 2019

ORDER

Service connection for skin cancer is denied.

An effective date prior to August 31, 2010, for the award of service connection for coronary artery disease, postoperative coronary artery bypass grafting with pacemaker implantation, is denied.

An effective date prior to August 31, 2010, for the award of service connection for surgical scarring, chest area, postoperative coronary artery bypass with pacemaker implantation, is denied.

An effective date prior to October 29, 2013, for the award of service connection for PTSD, is denied.

Initial ratings for coronary artery disease, postoperative coronary artery bypass grafting with pacemaker implantation, in excess of 10 percent from August 31, 2010 and 30 percent from June 9, 2015 to December 20, 2018, are denied.

An initial rating in excess of 70 percent for posttraumatic stress disorder (PTSD) with associated major depressive disorder, from October 29, 2013 to December 20, 2018, is denied.

An initial compensable rating for surgical scarring, chest area, postoperative coronary artery bypass with pacemaker implantation, from August 31, 2010 to December 20, 2018, is denied.

A total rating based on individual unemployability (TDIU) is granted from October 29, 2013.

Eligibility to Dependents’ Educational Assistance under 38 U.S.C. chapter 35 is granted from October 29, 2013.

FINDINGS OF FACT

1. The Veteran served in Vietnam and was exposed to herbicide agents. 

2. Skin cancer was not manifested in service or to a compensable degree within one year of separation from service, and is not otherwise attributable to service.

3. Ischemic heart disease, to include coronary artery disease, is a covered herbicide disease as of August 31, 2010; the Veteran’s coronary artery disease was initially diagnosed in 2004; the Veteran filed his claim for service connection for coronary artery disease on November 30, 2011; there is no record of an earlier claim that can reasonably be construed as a claim for coronary artery disease or ischemic heart disease.

4. The Veteran filed his claim for service connection for coronary disease, status post CABG, on November 30, 2011; there is no record of an earlier claim that can reasonably be construed as a claim for coronary artery disease or ischemic heart disease, or post-surgical scarring.

5. The Veteran filed his claim for service connection for PTSD on October 29, 2013; there is no record of an earlier claim that can reasonably be construed as a claim for PTSD.

6. Prior to June 9, 2015, the Veteran required continuous medication for his heart condition and had a left ventricle ejection fraction of 55-60 percent. The Veteran did not experience dyspnea, fatigue, angina, dizziness, or syncope with any level of activity; there was no evidence of congestive heart failure.

7. From June 9, 2015 to December 20, 2018, the Veteran had evidence of right ventricular dilation; the evidence did not show more than one episode of acute congestive heart failure in the past year; a workload of greater than 3 METs but less than 5 METs results in dyspnea, fatigue, angina, dizziness, or syncope; or left ventricular dysfunction with an ejection fraction of 30 to 50 percent.

8. From October 29, 2013 to December 20, 2018, the Veteran’s PTSD was manifested by deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood; total occupational and social impairment was not shown during this time period.

9. There is no medical evidence demonstrating that the Veteran’s postsurgical chest scarring is at least 144 square inches in area, or painful or unstable, or causes any functional impairment.

10. VA received the Veteran’s formal claim for a TDIU in June 2015; however, a claim for a TDIU was raised as part-and-parcel of the Veteran’s claim for a higher initial rating for PTSD.

11. Resolving reasonable doubt in the Veteran’s favor, the Veteran’s service-connected disabilities have precluded him from maintaining substantially gainful occupation since October 29, 2013.

12. A permanent and total disability rating was in effect on October 29, 2013, but not prior.

CONCLUSIONS OF LAW

1. The criteria for service connection for skin cancer have not been met. 38 U.S.C. §§ 1101, 1110, 1112, 5103; 38 C.F.R. §§ 3.102, 3.303, 3.307, 3.309.

2. The criteria for an effective date earlier than August 31, 2010, for an award of service connection for coronary artery disease, have not been met. 38 U.S.C. §§ 5101, 5110; 38 C.F.R. §§ 3.114, 3.816, 3.400.

3. The criteria for an effective date prior to August 31, 2010, for the award of service connection for surgical scarring, chest area, postoperative coronary artery bypass with pacemaker implantation have not been met. 38 U.S.C. § 5110; 38 C.F.R. § 3.400.

4. The criteria for an effective date earlier than October 29, 2013, for an award of service connection for PTSD have not been met. 38 U.S.C. § 5110; 38 C.F.R. § 3.400.

5. The criteria for initial ratings for coronary artery disease, postoperative coronary artery bypass grafting with pacemaker implantation, in excess of 10 percent from August 31, 2010 and 30 percent from June 9, 2015 to December 20, 2018, have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.102, 3.159, 4.1, 4.7, 4.104, Diagnostic Code 7017.

6. The criteria for an initial rating in excess of 70 percent for PTSD from October 29, 2013 to December 20, 2018, have not been met. 38 U.S.C. § 1155; 38 C.F.R. §§ 3.321, 4.7, 4.130, DC 9411.

7. The criteria for an initial compensable rating for surgical scarring, chest area, postoperative coronary artery bypass with pacemaker implantation, from August 31, 2010 to December 20, 2018, have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.31, 4.118, Codes 7802, 7804, 7805.

8. The criteria for an earlier effective date of October 29, 2013, for the grant of a TDIU have been met. 38 U.S.C. § 5107 (b); 38 C.F.R. §§ 3.1, 3.340, 3.341, 4.16, 4.19.

9. The criteria for an earlier effective date of October 29, 2013 for the grant of eligibility to Dependents' Educational Assistance under 38 U.S.C. chapter 35 have been met. 38 U.S.C. § 5110; 38 C.F.R. §§ 3.400, 21.3020, 21.3021.

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Board notes that the rating decisions on appeal were issued in October 2012, May 2014, and November 2015. In July 2018, the Veteran elected the modernized review system. 84 Fed. Reg. 138, 177 (Jan. 18, 2019) (to be codified at 38 C.F.R. § 19.2(d)).

The Veteran served on active duty from April 1967 to March 1970. The Veteran selected the Higher-Level Review lane when he submitted the RAMP election form in July 2018. Accordingly, the December 2018 RAMP rating decision considered the evidence of record as of the date VA received the RAMP election form. The Veteran timely appealed this RAMP rating decision to the Board and requested direct review of the evidence considered by the Agency of Original Jurisdiction (AOJ).

Service Connection

1. Service connection for skin cancer is denied.

The AOJ in the December 2018 RAMP decision rendered a favorable finding that VA medical evidence showed skin cancers based upon physical examinations and subsequent pathology reports beginning in 2010.

Service connection may be granted for a disability resulting from disease or injury incurred in or aggravated during active service. 38 U.S.C. § 1110; 38 C.F.R. § 3.303 (a). Generally, in order to establish service connection, there must be competent, credible evidence of (1) a current disability, (2) in-service incurrence or aggravation of an injury or disease, and (3) a nexus, or link, between the current disability and the in-service disease or injury. See Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009).

Service connection may be established for disability resulting from personal injury suffered or disease contracted in the line of duty in the active military, naval, or air service. 38 U.S.C. § 1110. That an injury or disease occurred in service is not enough; there must be chronic disability resulting from that injury or disease. If there is no showing of a resulting chronic condition during service, then a showing of continuity of symptomatology after service is required to support a finding of chronicity. 38 C.F.R. § 3.303 (b). Service connection may also be granted for any injury or disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease or injury was incurred in service. 38 C.F.R. § 3.303 (d).

Service connection may be established for a current disability on the basis of a presumption under the law that certain chronic diseases, to include malignant tumors, manifesting to a certain degree within a certain time after service must have had their onset in service. 38 U.S.C. §§ 1112, 1113, 1137; 38 C.F.R. §§ 3.303, 3.304, 3.307, 3.309(a).

Service connection may also be established for diseases associated with exposure to certain herbicide agents used in support of military operations in the Republic of Vietnam (Vietnam) during the specific time period will be considered to have been incurred in service. 38 U.S.C. § 1116 (a)(1); 38 C.F.R. § 3.307 (a)(6). The term “herbicide agent” means a chemical in an herbicide used in support of the United States and allied military operations in the Republic of Vietnam during the Vietnam era. Specifically, this includes 2,4-D; 2,4,5-7 and its contaminant TCDD; cacodylic acid; and picloram. 38 C.F.R. § 3.307 (a)(6). 

Effective August 31, 2010, 38 C.F.R. § 3.309 (e) provides that presumptive service connection based on Agent Orange exposure is available for ischemic heart disease (IHD) (including, but not limited to, acute, subacute, and old myocardial infarction; atherosclerotic cardiovascular disease including coronary artery disease (including coronary spasm) and coronary bypass surgery; and stable, unstable and Prinzmetal’s angina). However, the term “ischemic heart disease” does not include hypertension or peripheral manifestations of arteriosclerosis such as peripheral vascular disease or stroke, or any other condition that does not qualify within the generally accepted medical definition of IHD. 38 C.F.R. § 3.309 (e), Note 3 (effective August 31, 2010).

The Secretary of Veterans Affairs has determined that there is no positive association between exposure to herbicide agents and any other condition for which the Secretary has not specifically determined that a presumption of service connection is warranted. See 59 Fed. Reg. 341 -346 (1994); see also 61 Fed. Reg. 57586 -57589 (1996).

Notwithstanding the aforementioned provisions relating to presumptive service connection, which arose out of the Veteran’s Dioxin and Radiation Exposure Compensation Standards Act, Pub. L. No. 98-542, § 5, 98 Stat. 2,725, 2,727-29 (1984), and the Agent Orange Act of 1991, Pub. L. No. 102-4, § 2, 105 Stat. 11 (1991), a claimant is not precluded from establishing service connection with proof of actual causation. Combee v. Brown, 34 F.3d 1039, 1042 (Fed. Cir. 1994).

The Veteran’s current diagnosis of squamous cell carcinoma and basal cell carcinoma is well documented in the Veteran’s VA treatment records. These records indicate that skin cancers were first noted in 2004. 

Service treatment records do not show that the Veteran suffered from skin cancer while in service. His STRs are absent of any complaints, treatment, or diagnosis of skin cancer. At his separation examination in March 1970, his skin was noted as normal.

The Veteran’s DD Form 214 shows service in Vietnam. As such, the Veteran’s exposure to herbicide agents is conceded. While the Veteran is presumed to have been exposed to herbicide agents during his service in Vietnam, he cannot establish entitlement to service connection for skin cancer on a presumptive basis under 38 U.S.C. § 1116 (a)(1); 38 C.F.R. § 3.309 (e), because skin cancer, including squamous cell carcinoma and basal cell carcinoma, is not one of the enumerated diseases. 

Further, as there is no evidence showing initial manifestations of skin cancer in service, or to any degree within one year of separation from service, the one-year presumption for malignant tumors under 38 C.F.R. §§ 3.307 and 3.309 is not an avenue for service connection, nor are the provisions of 38 C.F.R. § 3.303 (b) pertaining to chronicity or continuity of symptomatology. See 38 C.F.R. §§ 3.303 (b), 3.307, 3.309. The evidence also does not reflect, nor does the Veteran contend, that a diagnosis of skin cancer was provided within a year of service discharge in March 1970. 

The fact that the Veteran cannot establish entitlement to service connection for skin cancer on a presumptive basis does not preclude him from establishing entitlement on a direct incurrence or other basis. See Combee v. Brown, 34 F.3d 1039 (Fed. Cir. 1994).

Based on a review of the evidence, service connection is not warranted on a direct basis. There is no medical evidence of record in support of the Veteran’s claim.

The Board acknowledges the Veteran’s assertions that his skin cancers were the result of his exposure to Agent Orange in Vietnam. However, as this issue is medically complex, as it involves internal disease processes and requires knowledge of interpretation of complicated diagnostic medical testing, he is not competent to provide a nexus opinion in this case. Jandreau v. Nicholson, 492 F.3d 1372, 1377 n.4 (Fed. Cir. 2007).

Since the competent and probative evidence of record fails to indicate that the Veteran’s skin cancer had onset in, or is otherwise related to service including as a result of presumed exposure to herbicide agents, service connection is not warranted. 

The Board notes that no examination was conducted nor is one warranted in conjunction with the service connection claim for skin cancer. In this regard, under 38 U.S.C. § 5103A (d), VA’s duty to assist includes providing a claimant a medical examination or obtaining a medical opinion when an examination or opinion is necessary to make a decision on a claim and the claims file contains competent evidence that the claimant has a current disability and indicates that the disability may be associated with the claimant’s service. The types of evidence that indicate that a current disability may be associated with military service include, but are not limited to, medical evidence that suggests a nexus but is too equivocal or lacking in specificity to support a decision on the merits, or credible evidence of continuity of symptomatology such as pain or other symptoms capable of lay observation. McLendon v. Nicholson, 20 Vet. App. 79, 83 (2006). 

Specifically, there is no indication that the Veteran’s skin cancer is related to service beyond the Veteran’s conclusory generalized lay statements. In this regard, the Board notes that a mere conclusory generalized lay statement that a service event or illness caused the claimant’s current condition is insufficient to require the Secretary to provide an examination. See Waters v. Shinseki, 601 F.3d 1274, 1278 (2010). The Court has held that VA is not required to provide a medical examination when there is not credible evidence of an event, injury, or disease in service. See Bardwell v. Shinseki, 24 Vet. App. 36 (2010). Therefore, the Board finds that a VA examination and/or opinion is not necessary to decide the claim.

As the preponderance of the evidence is against the claim under any applicable theory of service connection, the benefit of the doubt rule does not apply. 38 U.S.C. § 5107 (b); Gilbert, 1 Vet. App. at 53-56.

Effective Dates and Increased Ratings

Disability ratings are determined by applying a schedule of reductions in earning capacity from specific injuries or a combination of injuries that is based upon the average impairment of earning capacities. 38 U.S.C. § 1155. Each disability must be viewed in relation to its entire history, with emphasis upon the limitations proportionate to the severity of the disabling condition. 38 C.F.R. § 4.1.

Where there is a question as to which of the two disability evaluations is applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating; otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7. After careful consideration of the evidence of record, any reasonable doubt remaining will be resolved in favor of the Veteran. 38 C.F.R. § 4.3. When the appeal arises from an initial assigned rating, consideration must be given to whether staged ratings should be assigned to reflect entitlement to a higher rating at any point during the pendency of the claim. See Fenderson v. West, 12 Vet. App. 119, 126 (1999).

When rating the Veteran’s service-connected disability, the entire medical history must be reviewed. Schafrath v. Derwinski, 1 Vet. App. 589 (1991). The Board must also fully consider the lay assertions of record. See Layno v. Brown, 6 Vet. App. 465, 470 (1994).

Generally, except as otherwise provided, the effective date of an evaluation and award of pension, compensation, or dependency and indemnity compensation based on an original claim, a claim reopened after final disallowance, or a claim for increase will be the date of receipt of the claim, or the date entitlement arose, whichever is later. 38 U.S.C. § 5110; 38 C.F.R. § 3.400. The effective date of an original award of direct service connection is the day following separation from active service or the date entitlement arose if the claim is received within one year after separation from service; otherwise, date of receipt of claim, or date entitlement arose, whichever is later. 38 U.S.C. § 5110 (b); 38 C.F.R. § 3.400 (b)(2)(i).

2. Coronary artery disease 

The Veteran seeks an earlier effective date for the grant of service connection for CAD as well as higher initial ratings. The AOJ in the December 2018 RAMP decision rendered favorable findings that the Veteran had VA medical evidence establishing coronary artery disease, status postoperative bypass grafting and pacemaker implantation in 2004; and October 2015 echocardiogram at a VAMC that showed mild right ventricular dilatation.

Effective Date 

As discussed above, the Veteran is considered a Vietnam veteran. The award of coronary artery disease was based on presumptive service connection related to exposure to herbicide agents. See 38 C.F.R. § 3.309 (e) (providing presumptive service connection for ischemic heart disease, which includes coronary artery disease). The effective date of the liberalizing law for coronary artery disease was August 31, 2010. 75 Fed. Reg. 53202 (Aug. 31, 2010). While the special Nehmer provisions require a covered herbicide disease to be a disease for which the Secretary of VA established a presumption of service connection before October 1, 2002, the final rule for the liberalizing law made clear the effective dates of awards of coronary artery disease under § 3.309(e) are governed by the Nehmer provisions. 75 Fed. Reg. 53202. Thus, the Veteran is considered a Nehmer class member with a covered herbicide disease, and the provisions of § 3.816 are for application.

The Board finds that the Veteran is not eligible for an earlier effective date pursuant to § 3.816(c)(1) or (2) because the record contains no evidence that he filed a claim for coronary artery disease, formal or informal, prior to August 31, 2010, the effective date of the liberalizing law for coronary artery disease. An earlier effective date pursuant to § 3.816(c)(3) is not warranted because the Veteran did not submit a claim for coronary artery disease, formal or informal, within one year of the date of his separation from service. Accordingly, § 3.816(c)(4) directs the Board to continue its review in accordance with §§ 3.114 and 3.400.

The Veteran filed his claim for service connection for coronary artery disease on November 30, 2011. The RO in its RAMP decision incorrectly found that the claim was filed November 30, 2010, which would have been within one year of the effective date of the liberalizing law for coronary artery disease, August 31, 2010. The RO thus assigned an effective date of August 31, 2010.

Pursuant to § 3.114(a)(3), if a claim is reviewed at the request of the claimant more than 1 year after the effective date of the liberalizing law, benefits may be authorized for a period of 1 year prior to the date of such request. In order to be eligible for such a finding, the evidence must show that the claimant met all eligibility criteria for the liberalized benefit on the effective date of the liberalizing law and such eligibility existed continuously from that date to the date of the claim. 38 C.F.R. § 3.114 (a). In this case, VA received a claim of service connection for coronary artery disease on November 30, 2011. This was more than 1 year after the effective date of the liberalizing law. Under § 3.400, the earliest effective date for service connection would be the date of receipt of the claim, which is November 30, 2011.

Based on the facts of this case, the earliest effective date allowed under VA law and regulation would be November 30, 2010, as provided by § 3.114. Because the RO has already assigned a date earlier, August 31, 2010, the Board will not disturb that decision. The claim for an effective date earlier than August 31, 2010, is denied.

Higher Rating

The Veteran’s service-connected CAD is assigned staged ratings under DC 7017-7005. Therefore, the Board will consider whether an initial rating in excess of 10 percent is warranted from August 31, 2010 to June 8, 2015, and whether a rating in excess of 30 percent is warranted from June 9, 2015 until the date of the December 20, 2018 rating decision on appeal.

Under DC 7017, a 10 percent rating is warranted for a workload greater than 7 METs but less than 10 METs that results in dyspnea, fatigue, angina, dizziness, or syncope or where continuous medication is required. A 30 percent rating is warranted where a workload of greater than 5 METs but less than 7 METs results in dyspnea, fatigue, angina, dizziness, or syncope or there is evidence of cardiac hypertrophy or dilation. A 60 percent rating is warranted where there is more than one episode of acute congestive heart failure in the past year; a workload of greater than 3 METs but less than 5 METs results in dyspnea, fatigue, angina, dizziness, or syncope; or where there is left ventricular dysfunction with an ejection fraction of 30 to 50 percent. A 100 percent rating is warranted where there is chronic congestive heart failure; a workload of 3 METs or less results in dyspnea, fatigue, angina, dizziness, or syncope; or where there is left ventricular dysfunction with an ejection fraction of less than 30 percent. 38 C.F.R. § 4.104, Diagnostic Code (DC) 7017.

The Veteran underwent coronary artery bypass graft and implementation of a pacemaker in 2004.

VA examination in April 2012 noted that the Veteran did not have chronic heart failure. METs testing was not accomplished, however the examiner noted that the Veteran denied having symptoms of dyspnea, fatigue, angina, dizziness, or syncope with any level of physical activity. There was no evidence of cardiac hypertrophy or dilatation. EKG, chest X-ray and echocardiogram were conducted. Left ventricular ejection fraction was 55-60 percent. 

The Veteran filed a claim for increased rating on June 9, 2015. The Veteran did not report for a scheduled VA heart examination in September 2015.

VA echocardiogram in October 2015 showed ejection fraction of 55-60 percent. The left ventricle was of normal size and had normal systolic function. There was grade I diastolic dysfunction. The right ventricle was mildly dilated. 

The Board finds that prior to June 9, 2015, the criteria for a rating in excess of 10 percent were not shown. The April 2012 examination noted no complaints of dyspnea, fatigue, angina, dizziness, or syncope with any level of physical activity. There was no evidence of cardiac hypertrophy or dilatation. Left ventricular ejection fraction was 55-60 percent. 

As the record did not demonstrate that a workload of greater than 5 METs but less than 7 METs results in dyspnea, fatigue, angina, dizziness, or syncope or there was evidence of cardiac hypertrophy or dilation, a 30 percent rating was not warranted.

For the period beginning June 9, 2015, a 30 percent is warranted based on the October 2015 echocardiogram that noted right ventricular dilation. However, the criteria for a 60 percent rating have not been shown.

As the record did not show evidence of more than one episode of acute congestive heart failure in the past year; a workload of greater than 3 METs but less than 5 METs results in dyspnea, fatigue, angina, dizziness, or syncope; or left ventricular dysfunction with an ejection fraction of 30 to 50 percent, a 60 percent rating was not warranted.

3. PTSD

The AOJ in the December 2018 RAMP decision did not render any favorable findings with respect to the PTSD issues.

Effective Date

The Veteran’s formal claim for service connection for PTSD date-stamped as being received by VA on October 29, 2013. There is no record of an earlier claim for service connection for a psychiatric disability. As the Veteran’s claim for service connection for PTSD was received more than one year after his separation from service, the proper effective date is the date of receipt of claim, or date entitlement arose, whichever is later. 38 U.S.C. § 5110 (b); 38 C.F.R. § 3.400 (b)(2)(i). Consequently, there is no basis for awarding an effective date prior to October 29, 2013 for the grant of service connection for PTSD, and the claim is denied.

Higher Rating

The Veteran’s service-connected PTSD has been assigned an initial 70 percent rating from the date of claim, October 29, 2013.

Under the General Rating Formula for Mental Disorders, Diagnostic Code 9411, a 70 percent rating contemplates occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); inability to establish and maintain effective relationships. 

The criteria for a 100 percent rating are total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent ability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. 38 C.F.R. § 4.130, Diagnostic Code 9411.

Ratings are assigned according to the manifestation of particular symptoms, but the use of the term “such as” in the General Rating Formula demonstrates that the symptoms after the phrase are not intended to constitute an exhaustive list, but rather are to serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating. Mauerhan v. Principi, 16 Vet. App. 436 (2002).

A December 2013 treatment record noted that the Veteran denied suicidal or homicidal ideation as well as psychotic symptoms.

On VA examination in May 2014, the examiner noted that the Veteran’s service connected psychiatric disability resulted in occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking and/or mood. The Veteran reported that he had been married and divorced three times. He was currently not in a significant relationship, he had not been in one since his last divorce in 2004 and was not interested in being in one. He said that he would “fight in a heartbeat,” but denied ever striking his wives. He said that he generally got along with his wives “all right” during his marriages. He said, however, that his wives thought that he was “crazy,” and he reiterated that he was “just too wild.” The Veteran had two adult daughters with his second wife. He interacted with his daughters weekly, mostly over the phone. He occasionally got together with his daughters. He also had three grandchildren. The Veteran reported that he generally got along with people, “now that [he cannot] fight” anymore. He generally avoided people due to the potential for conflict. He participated in VFW activities “once in a while,” citing the geographic distance between his home and the nearest post. He attended AmVets activities twice weekly. When he interacted with other Veterans through Am Vets, he avoided talk of the military or of Vietnam specifically. Aside from his interactions with other Veterans through AmVets and occasional interactions with family members, he had no other socialization experiences. The Veteran was generally inactive and he spent most of his time watching television. He lived alone and engaged in no structured activities or hobbies. He might go to the grocery store once per week; he would go early in the morning, wanting to get in and out as quickly as he could. The Veteran noted that he interacted with one brother and one sister over the phone about monthly. He did not get along with his older brother, who was now deceased. He had no contact with his twin sisters. He said that even though he had known some friends for many years, he generally did not interact with them. He did not cook, but generally ate sandwiches and soups. He performed his personal hygiene habits daily. 

On examination, the Veteran was clean, neatly groomed, and appropriately dressed. He was fully oriented. His mood was moderately depressed and anxious. His affect was restricted. He was tearful at times. The Veteran’s speech rate and tone were unremarkable. His thought content and progression were unremarkable. There were no loose associations or flight of ideas. The Veteran denied suicidal ideation or homicidal ideation. There were no hallucinations or delusions. There was no evidence to suggest difficulty with attention and concentration during the evaluation. Insight and judgment were fair. Memory was within normal limits.

A December 2014 treatment record noted the Veteran reported he was doing “fair.” He denied suicidal or homicidal ideation as well as psychotic symptoms.

On VA examination in July 2015, the examiner noted the Veteran’s psychiatric disability resulted in occupational and social impairment with reduced reliability and productivity. The Veteran reported that he had been single since 2004. He had no interest in a relationship as he “just want[s] to be left alone.” The Veteran had two adult daughters from his 2nd marriage. He described fairly close relationships with his daughters. He also had three young grandchildren that he was able to visit with often. The Veteran reported that he had very little interaction with them - “I don’t play with them... I just sit in the chair.” The Veteran denied having any friends. He went to AmVets once or twice a month and socialized with the other members. “We don’t talk no war stuff, just sports.” The Veteran reported that he went to WalMart in the middle of the night to do his grocery shopping as he was uncomfortable going out during the day - “there’s too many weirdos out there.” The Veteran spent most of his day watching TV at home. He stated he did do housework on occasion and noted his house was “not filthy.”

A private psychological evaluation conducted in October 2015 noted the Veteran reported irritability and hopelessness. The Veteran reported that he had withdrawn from other people and could not be around people as he felt unsafe. The Veteran reported that he had two daughters who lived in the area. They bring their three children to see him he enjoyed them very much. 

On examination, his behavior was normal. Eye contact was average. His speech was normal in rate but he answered in incomplete sentences. There was no abnormality in his thought content. Delusions were also denied. The Veteran reported that he did not trust anyone. He did not like to be in crowds. He liked to be by himself. He denied any obsessive compulsive behavior. The Veteran reported that sometimes he wished to die and stated that on one occasion in the past he swallowed all his pills. He felt useless and hopeless. He would not bathe for days and would not get out of bed. He denied hallucinations. The Veteran was oriented to person, place, time, and situation. Judgment was appropriate in the sense that he would not be of harm to himself or others. He was hypervigilant of all of his surroundings. He stated that he carried a gun for self-defense and tried to avoid others. Concentration was fair. Insight was fair. The Veteran seemed able to manage his finances.

A rating higher than 70 percent is not warranted because the evidence does not reflect that the Veteran’s symptoms have resulted in a total occupational or social impairment. Indeed, while the Veteran’s symptoms have resulted in deficiencies in many areas, he has maintained relationships with family members and retained his ability to interact with others, albeit on a limited basis. His communication skills have also remained intact and he is not shown to be a danger to himself or others. Additionally, the examination reports and treatment records show he has been alert, oriented, and well-groomed, without any indication of a gross or total impairment in overall functioning to warrant a total schedular rating under the rating schedule.

Accordingly, the Board finds that an initial rating in excess of 70 percent is not warranted at any point during the appeal period. 38 U.S.C. § 5107; 38 C.F.R. § 4.3.

4. Chest Scarring

The Veteran seeks an earlier effective date and higher initial rating for his service-connected chest scarring. The AOJ in the December 2018 RAMP decision rendered favorable findings that the Veteran had VA medical evidence establishing coronary artery disease, status postoperative bypass grafting and pacemaker implantation in 2004.

Effective Date

As noted in the above discussion of the effective date of the grant of service connection for coronary artery disease, the AOJ assigned an effective date of August 31, 2010 for the award of service connection based on the date of the liberalizing law for coronary artery disease. The same analysis applies to the award of service connection for chest scarring. Based on the facts of this case, the earliest effective date allowed under VA law and regulation would be November 30, 2010, as provided by § 3.114. Because the RO has already assigned a date earlier, August 31, 2010, the Board will not disturb that effective date. The claim for an even earlier effective date is denied.

Higher Rating

In every instance where the schedule does not provide a zero percent evaluation for a diagnostic code, a zero percent evaluation shall be assigned when the requirements for a compensable evaluation are not met. 38 C.F.R. § 4.31.

In a November 2015 rating decision, the AOJ granted service connection for surgical scarring, chest area, postoperative coronary artery bypass with pacemaker implantation. An initial noncompensable rating was assigned. The rating decision noted that the Veteran did not attend the VA examination scheduled in connection with the claim, and did not show good cause for his failure to do so. 

The rating decision noted that “although we do not have the exact specifications for your CABG scar, it is VA policy to grant this scar when there is evidence showing a CABG took place. The evidence showed you had this procedure done in 2004.”

An August 2014 dermatology clinic note referred to a well-healed linear scar at the site of previous surgery.

Scars are evaluated under 38 C.F.R. § 4.118, Codes 7800 through 7805. Code 7800 applies to scars of the head, face, and neck (and therefore does not apply in this case). 

Code 7801 applies to scars, not of the head, face, or neck that are deep and nonlinear. A 10 percent rating is assigned for an area or areas of at least 6 square inches (39 square centimeters) but less than 12 square inches (77 square centimeters). Note 2 provides that a deep scar is one associated with underlying soft tissue damage. 38 C.F.R. § 4.118.

Superficial and nonlinear scars not of the head, face, or neck are rated under Code 7802, which provides for a 10 percent rating for scars with an area or areas of at least 144 square inches (929 square cm). Note 2 following defines a superficial scar as one not associated with underlying soft tissue damage. 38 C.F.R. § 4.118, Code 7802 and note following.

Under Code 7804 (for scars that are unstable or painful) a 10 percent rating is assigned for one or two qualifying scars, a 20 percent rating for three or four qualifying scars, and a 30 percent rating for five or more qualifying scars. Note 1 following defines an unstable scar as one where, for any reason, there is frequent loss of covering of skin over the scar. 38 C.F.R. § 4.118.

Under Code 7805 any disabling effect(s) [of scars] not considered in a rating under Codes 7800-04 are to be rated under an appropriate Code. 38 C.F.R. § 4.118.

Here, due to the Veteran’s failure to report for examination, there is no medical evidence to support a compensable rating for his chest scarring under any applicable Code. Accordingly, the claim is denied.

5.TDIU prior to June 09, 2015

 The Veteran seeks entitlement to an effective date prior to June 9, 2015 for a TDIU. 

The AOJ in the December 2018 RAMP decision did not render any favorable findings with respect to the TDIU issue.

A claim for TDIU may be filed as a freestanding claim. In addition, TDIU may be an element of a claim for an increased disability rating when unemployability is raised by the record. See Rice v. Shinseki, 22 Vet. App. 447 (2009). Except as otherwise provided, the effective date of a claim for increase will be the date of receipt of the claim or the date entitlement arose, whichever is later. 38 U.S.C. § 5110; 38 C.F.R. § 3.400. A TDIU claim is one for increased compensation; therefore, the effective date rules for increased compensation apply to a TDIU claim. Rice v. Shinseki, 22 Vet. App. 447, 454 (2009); Hurd v. West, 13 Vet. App. 449, 451-52 (2000). The effective date of an award for increased disability compensation shall be the earliest date as of which it is factually ascertainable that an increase in disability has occurred, if the claim is received within one year from such date; otherwise, it is the date of receipt of the claim. 38 U.S.C. § 5110 (b)(2); 38 C.F.R. § 3.400 (o)(2); see also Hazan v. Gober, 10 Vet. App. 511 (1997) (requiring VA to consider the evidence of disability during the period one year prior to the application in order to determine when a factually ascertainable increase in disability occurred).

A “claim” is defined as a formal or informal communication, in writing, requesting a determination of entitlement, or evidencing a belief in entitlement to a benefit. 38 C.F.R. § 3.1 (p). In general, “date of receipt” means the date on which a claim, information, or evidence was received by VA. 38 C.F.R. § 3.1 (r).

Total disability ratings for compensation may be assigned when a veteran is unable to secure and follow a substantially gainful occupation. 38 U.S.C. § 1155; 38 C.F.R. §§ 3.340, 3.341, 4.16. If the schedular rating is less than total, a total disability evaluation can be assigned based on individual unemployability if the Veteran is unable to secure or follow a substantially gainful occupation as a result of service connected disability provided that if there is only one such disability, this disability shall be ratable at 60 percent or more; if there are two or more disabilities, there shall be at least one disability ratable at 40 percent or more, and sufficient additional disability to bring the combined rating to 70 percent or more. 38 C.F.R. § 4.16 (a).

In this case, the Veteran’s claim for service connection for PTSD was received October 29, 2013. The Veteran disagreed with the initial rating. As noted above, he has been assigned an initial 70 percent rating for PTSD since October 29, 2013. 

The Veteran filed a formal claim for TDIU in June 2015. In a November 2015 rating decision, the AOJ granted TDIU from June 9, 2015. The Veteran contends that his TDIU is warranted from the effective date of the PTSD award.

Pursuant to Rice, entitlement to a TDIU is considered part and parcel of his claim for a higher initial rating. Thus, the effective date of the award of service connection for PTSD could potentially be assigned as the effective date for his TDIU, if the evidence shows that he met the schedular criteria and was unable to secure or follow a substantially gainful occupation due to his service-connected disabilities, including his PTSD, since that time. For the reasons that follow, the Board finds that an earlier effective date of October 29, 2013, is warranted. 

The Veteran’s PTSD has been rated 70 percent since October 29, 2013. His coronary artery disease, status post CABG with pacemaker, was rated 10 percent from August 31, 2010, and 30 percent from June 9, 2015. His combined service connected disability rating was 70 percent from October 29, 2013, and 80 percent from June 9, 2015.

Based on the foregoing, the Veteran met the criteria for an award of schedular TDIU as of October 29, 2013. Thus, the central inquiry is whether the Veteran’s service-connected disabilities alone are of sufficient severity to produce unemployability. Hatlestad v. Brown, 5 Vet. App. 524 (1993). Consideration may be given to the Veteran’s education, special training, and previous work experience, but not to his age or to the impairment caused by non-service-connected disabilities. 38 C.F.R. §§ 3.341, 4.16, 4.19; Van Hoose v. Brown, 4 Vet. App. 361 (1993). 

On his March 2015 application for a TDIU, the Veteran indicated he last worked in 2012 as a lighting technician and that all of his service-connected disabilities prevented him from securing or following any substantially gainful occupation. See VA Form 21-8940. The Veteran further reported an eighth-grade education.

 A July 2013 award letter from the Social Security Administration (SSA) indicates the Veteran was found to have become disabled for SSA purposes in March 2012. This determination was based on the Veteran’s heart disease and psychiatric disability.

The Board finds that the evidence of record establishes that the Veteran’s service-connected PTSD, which has been rated as 70 percent disabling from the date of service connection, is significant enough to preclude him from securing or following a substantially gainful occupation. The record indicates that he has limitations regarding concentration, focus, and symptoms of paranoia and irritability which render him unable to be substantially, gainfully employed. Thus, resolving all reasonable doubt in the Veteran’s favor, the Board finds that the Veteran’s service-connected PTSD has precluded him from securing or following substantially gainful occupation in accordance with his background and education level since October 29, 2013.

In conclusion, the issue of entitlement to a TDIU was raised as part and parcel of the claim for a higher initial rating for PTSD, which was filed in connection with the grant of service connection for this disability effective October 29, 2013. See Rice v. Shinseki, 22 Vet. App. 447, 453 (2009); see also Harper v. Brown, 10 Vet. App. 125 (1997) (the Veteran’s notice of disagreement with the initial rating assigned in connection with the grant of service connection, combined with evidence of unemployability, resulted in the issue of entitlement to a TDIU from the effective date of the grant of service connection being on appeal). The date of claim for purposes of the effective date for the grant of TDIU is therefore October 29, 2013, which is the effective date of the grant of service connection for PTSD. Accordingly, entitlement to a TDIU from October 29, 2013, is warranted.

6.Dependents’ Educational Assistance under 38 U.S.C. chapter 35 prior to June 9, 2015

Given the above award of an effective date of October 29, 2013 for the award of TDIU, it therefore follows that the Veteran’s basic eligibility for Dependents’ Educational Assistance arose October 29, 2013, the effective date he was found to be totally and permanently disabled due to a service-connected disability, but not earlier. 

The Board notes that basic eligibility for certification of DEA under 38 U.S.C. Chapter 35 (authorizing education or special restorative training for an eligible person if the applicable criteria are met) is met if the veteran was discharged from service under conditions other than dishonorable and has a permanent total service-connected disability. 38 U.S.C. §§ 3500, 3501; 38 C.F.R. §§ 3.807, 21.3020, 21.3021(a)(iii). 

As the only method of eligibility for Chapter 35 benefits which is relevant to the Veteran is through having a permanent total service-connected disability, the effective date for Dependents’ Educational Assistance benefits is directly predicated on the effective date from which VA considered that the Veteran’s permanent and total disability commenced for purposes of VA benefits. See 38 C.F.R. § 21.3021 (a)(iii), (p), (r). In light of the Board’s current finding that entitlement to a TDIU arose October 29, 2013, but not earlier, an effective date of October 29, 2013, for establishing eligibility for Chapter 35 benefits is also warranted. See 38 C.F.R. § 3.400 (a).

 

 

D. JOHNSON

Veterans Law Judge

Board of Veterans’ Appeals

Attorney for the Board M. G. Mazzucchelli, Counsel

The Board’s decision in this case is binding only with respect to the instant matter decided. This decision is not precedential, and does not establish VA policies or interpretations of general applicability. 38 C.F.R. § 20.1303.