﻿Citation Nr: AXXXXXXXX
Decision Date: 09/30/19 Archive Date: 09/30/19

DOCKET NO. 190514-5335
DATE: September 30, 2019

ORDER

Entitlement to service connection for hypertension is granted. 

Entitlement to an effective date earlier than April 16, 2007, for the award of service connection for posttraumatic stress disorder (PTSD) (previously evaluated as panic disorder without agoraphobia) is denied.

Entitlement to an effective date earlier than April 16, 2007, for the award of service connection for headaches is denied.

Entitlement to an initial compensable rating from April 16, 2007 to August 6, 2016, and a rating in excess of 50 percent from August 7, 2016 for service-connected headaches is denied.

Entitlement to a rating in excess of 10 percent from September 18, 2015, for service-connected right elbow medial epicondylitis (right elbow disability) based on limitation of extension is denied.

Entitlement to a rating in excess of 10 percent from September 18, 2015, for service-connected right elbow disability (major) based on limitation of supination and pronation is denied.

Entitlement to an effective date prior to September 18, 2015, for the award of separate 10 percent disability ratings for service-connected right elbow disability is denied.

REMANDED

Entitlement to service connection for obstructive sleep apnea (OSA), to include as secondary to service-connected PTSD, is remanded.

Entitlement to service connection for lymphoma is remanded.

Entitlement to an initial rating in excess of 30 percent prior to June 13, 2016, and in excess of 70 percent thereafter, for service-connected PTSD, is remanded.

Entitlement to a temporary total percent evaluation under 38 C.F.R. § 4.29 (2018) is remanded.

Entitlement to a total disability rating based on individual unemployability (TDIU) due to service-connected disabilities is remanded.

FINDINGS OF FACT

1. Resolving all reasonable doubt in the Veteran’s favor, his currently-diagnosed hypertension had its onset during his active duty service.

2. The Veteran’s initial claim for service connection for an acquired psychiatric disorder and headaches was received on April 16, 2007, and this date represents the earliest possible effective date for the award of service connection for PTSD and headaches.

3. From April 16, 2007, to August 6, 2016, the preponderance of the evidence demonstrates that the Veteran’s service-connected headaches was not manifested by characteristic prostrating attacks.

4. From August 7, 2016, the Veteran was in receipt of the maximum schedular rating for his service-connected headaches.

5. From September 18, 2015, the preponderance of the evidence fails to demonstrate that the Veteran’s service-connected gout resulted in a chronic residuals of the right elbow (major) manifested by ankylosis; flexion limited to 90 degrees or less; extension limited to 45 degrees or more; motion lost beyond the last quarter of the arc, with the hand not approaching full pronation; or motion lost beyond the middle of the arc.

6. The Veteran did not initiate an appeal of the June 2010 rating decision that denied his claim for an initial compensable rating for his service-connected right elbow disability.

7. Following the June 2010 rating decision, the Veteran’s claim for an increased rating for his service-connected right elbow disability was received on September 18, 2015, and it was not factually ascertainable that an increase in disability took place within one year of that date.

CONCLUSIONS OF LAW

1. The criteria for service connection for hypertension are met. 38 U.S.C. §§ 1110, 1131, 5107 (2012); 38 C.F.R. §§ 3.102, 3.303 (2018).

2. The criteria for an effective date earlier than April 16, 2007, for the award of service connection for PTSD are not met. 38 U.S.C. § 5110(a) (2012); 38 C.F.R. §§ 3.1(p), (r), 3.151(a), 3.159, 3.400(b)(2) (2014).

3. The criteria for an effective date earlier than April 16, 2007, for the award of service connection for headaches are not met. 38 U.S.C. § 5110(a); 38 C.F.R. §§ 3.1(p), (r), 3.151(a), 3.159, 3.400(b)(2) (2014).

4. The criteria for an initial compensable rating from April 16, 2007 to August 6, 2016, and a rating in excess of 50 percent from August 7, 2016, to May 1, 2018, for service-connected headaches are not met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.124a, Diagnostic Code 8100 (2018).

5. From September 18, 2015, the criteria for a rating in excess of 10 percent for service-connected gout of the right elbow based on limitation of extension are not met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5003, 5207 (2018).

6. From September 18, 2015, the criteria for a rating in excess of 10 percent for service-connected gout of the right elbow based on limitation of supination and/or pronation are not met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.40, 4.45, 4.59, 4.71a, Diagnostic Code 5213 (2018).

7. The criteria for an effective date prior to September 18, 2015, for the award of separate 10 percent disability ratings for service-connected right elbow disability are not met. 38 U.S.C. § 5110; 38 C.F.R. §§ 3.155, 3.157 (in effect prior to March 24, 2015), 3.400, 4.71a, Diagnostic Codes 5003, 5206, 5207, 5213 (2018).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Veteran served on active duty from December 1989 to June 1999.

On August 23, 2017, the President signed into law the Veterans Appeals Improvement and Modernization Act, Pub. L. No. 115-55 (to be codified as amended in scattered sections of 38 U.S.C.), 131 Stat. 1105 (2017), also known as the Appeals Modernization Act (AMA). This law creates a new framework for Veterans dissatisfied with VA’s decision on their claim to seek review. The Veteran chose to participate in VA’s test program, the Rapid Appeals Modernization Program (RAMP). This decision has been written consistent with the new AMA framework.

By way of background, in a May 2016 rating decision, the agency of original jurisdiction (AOJ) denied the Veteran’s claim for a TDIU, his claim for service connection for lymphoma, and his claim for a temporary total disability evaluation based on surgery requiring convalescence or for hospitalization for more than 21 days. The Veteran timely initiated an appeal as to these issues.

In a July 2016 rating decision, the AOJ granted separate 10 percent disability rating to the Veteran’s service-connected right elbow disability, effective September 18, 2015. It also denied service connection for hypertension. The Veteran timely initiated an appeal as to the ratings assigned to his service-connected right elbow disability, the effective dates of the increased ratings, and his claim of entitlement to service connected for hypertension.

In May 2017, the AOJ awarded connection for headaches, and assigned an initial noncompensable rating prior to August 7, 2016, and a 50 percent disability rating thereafter. The AOJ also awarded service connection for PTSD (previously evaluated as panic disorder without agoraphobia), and assigned an initial 30 percent disability rating prior to June 13, 2016, and a 70 percent disability rating thereafter. The Veteran then initiated a timely appeal as to the ratings assigned to his service-connected headaches and PTSD, as well as to the effective dates assigned to the award of service connection.

In a July 2017 rating decision, the AOJ denied the Veteran’s claim for service connection for OSA. The Veteran timely initiated an appeal.

In May 2018, the Veteran submitted a RAMP opt-in election form, and selected the Higher-Level Review. Accordingly, the November 2018 RAMP rating decision on appeal considered the evidence of record as of the date VA received the RAMP election form, May 1, 2018. In May 2019, the Veteran timely appealed all decisions in the November 2018 RAMP rating decision to the Board, and he requested the Evidence Submission process.

The Board notes that evidence was added to the claims file during a period of time when new evidence was not allowed, including after the May 2018 RAMP opt-in election form was received, but prior to the November 2018 RAMP rating issued, as well as after the November 2018 RAMP rating decision but prior to the 90-day evidence submission period stemming from his May 2019 appeal to the Board. Therefore, the Board may not consider this evidence. 84 Fed. Reg. 138, 182 (Jan. 18, 2019) (to be codified at 38 C.F.R. § 20.300). The Veteran may file a Supplemental Claim and submit or identify this evidence. 84 Fed. Reg. 138, 182 (Jan. 18, 2019) (to be codified at 38 C.F.R. § 3.2501). If the evidence is new and relevant, VA will issue another decision on the claim, considering the new evidence in addition to the evidence previously considered. Id. Specific instructions for filing a Supplemental Claim are included with this decision.

Finally, as noted above, the Veteran’s RAMP opt-in election form was received on May 1, 2018. At that time, the issues of entitlement to an initial compensable rating for service-connected lipoma, multiple sites, and entitlement to an extraschedular rating for service-connected bilateral plantar fasciitis were on appeal; however, in the November 2018 RAMP rating decision, the AOJ did not adjudicate these issues. Therefore, the Board cannot adjudicate those issues. The Veteran may resubmit the review request to the AOJ or notify the AOJ that the issue is still pending.

I. Service Connection for Hypertension

Service connection may be granted for disability resulting from disease or injury incurred in or aggravated by active service. 38 U.S.C. §§ 1110, 1131, 5107; 38 C.F.R. § 3.303. The three-element test for service connection requires evidence of: (1) a current disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the current disability and the in-service disease or injury. Shedden v. Principi, 381 F.3d 1163, 1166-67 (Fed. Cir. 2004).

The Veteran claims entitlement to service connection for hypertension as a result of his military service. Specifically, the Veteran contends that his hypertension initially manifested during service. 

The Board concludes that the Veteran’s currently-diagnosed hypertension began during active service. 38 U.S.C. §§ 1110, 1131, 5107(b); Holton v. Shinseki, 557 F.3d 1363, 1366 (Fed. Cir. 2009); 38 C.F.R. § 3.303(a).

The evidence against the claim includes a July 2016 VA examiner’s opinion that the Veteran’s currently-diagnosed hypertension was less likely than not related to his military service. The examiner reasoned that the Veteran’s blood pressure reading of 141/90 during service was insufficient to demonstrate the onset of hypertension during service. The examiner also noted that the Veteran’s blood pressure readings following service were below the threshold of 90 diastolic until March 2009, and two separate readings of 90 or more were not until 2015, sixteen years after the Veteran separation from service. The examiner also noted that the Veteran denied any issues related to hypertension in December 2000.

The evidence in favor of the claim includes an August 2016 private medical opinion from Dr. M.S. who opined that the Veteran’s hypertension at least as likely has not had it onset during active duty service. Dr. M.S. noted in-service elevated blood pressure readings from October 1990, October 1992, and April 1995; he also noted that his blood pressure readings were consistently elevated throughout the remainder of his service. Dr. M.S. then stated that the Veteran’s blood pressure was aggravated beyond its natural progression during his military service, and that medical literature demonstrated that stressors, including military service, could greatly and negatively impact the advancement of hypertension. Dr. M.S. then noted that the July 2016 VA examiner’s opinion was not supported by the Veteran’s service treatment records, and that his service treatment records show numerous readings and a long-standing history to support of a diagnosis of hypertension.

Upon review of the record, the Board finds the evidence to at least be in equipoise as to whether the Veteran’s current hypertension had its onset during his active duty service. Accordingly, after resolving all doubt in favor of the Veteran, the Board finds that service connection for hypertension is warranted. 38 U.S.C. § 5107; 38 C.F.R. § 3.102.

II. Effective Dates for the Award of Service Connection for PTSD and Headaches

In general, except as otherwise provided, the effective date of an evaluation based on an original claim will be the date of receipt of the claim or the date entitlement arose, whichever is the later. 38 U.S.C. § 5110(a); 38 C.F.R. § 3.400. 

Effective March 24, 2015, VA amended its adjudication regulations to require that all claims governed by VA’s adjudication regulations be filed on standard forms prescribed by the Secretary. See 79 Fed. Reg. 57,660 (Sept. 25, 2014). This rulemaking also eliminated the constructive receipt of VA reports of hospitalization or examination and other medical records as informal claims for increase, and revised 38 C.F.R. § 3.400(o)(2). These amendments are applicable with respect to claims and appeals filed on or after March 24, 2015, and, therefore, are not applicable in the present case. Id. at 57,686.

Under the former regulations applicable in this case, any communication indicating intent to apply for a benefit under the laws administered by the VA may be considered an informal claim provided it identifies, but not necessarily with specificity, the benefit sought. See 38 C.F.R. § 3.155(a). To determine when a claim was received, the Board must review all communications in the claims file that may be construed as an application or claim. See Quarles v. Derwinski, 3 Vet. App. 129, 134 (1992).

By way of background, the Veteran’s initial claim for service connection for headaches were received on April 16, 2007. See April 2007 VA Form 21-526. In an accompanying statement, he stated that he was the victim of an attack during service. See April 2007 VA Form 21-4138. The AOJ interpreted this statement as a claim of entitlement to service connection for an acquired psychiatric disorder. The Veteran’s claims were initially denied in a September 2008 rating decision and spent many years in the appellate process. In a May 2017 decision, the Board granted service connection for both claimed disabilities. A May 2017 rating decision effectuated the Board’s decision and assigned effective dates of April 16, 2007, for the award of service connection for PTSD and headaches.

In August 2017, the Veteran filed a timely notice of disagreement with the May 2017 rating decision. On the notice of disagreement, he checked the boxes indicating that he disagreed with both the evaluation of the disability (discussed below) as well as the effective dates assigned. Notably, the Veteran has not identified a reason for his disagreement with the assigned effective dates, nor has he identified a submission prior to April 16, 2007, that should have been interpreted as a claim for either disability.

In reviewing the claims file, there is no communication received by VA prior to his April 16, 2007, submission that can be interpreted as an informal claim for service connection for an acquired psychiatric disorder and/or headaches. Indeed, prior to April 16, 2007, the Veteran had never filed a claim for compensation or for any other VA-related benefits. Furthermore, there was no communication from the Veteran that referred to specific medical records that contained a reasonably ascertainable diagnosis of an acquired psychiatric disorder or headaches. Cf. Shea v. Wilkie, 926 F.3d 1362 (Fed. Cir. 2019). 

The law and regulations governing effective dates preclude the assignment of an effective date earlier than April 16, 2007. As such, his claims must be denied. 

III. Higher Rating for Service-Connected Headaches

Disability evaluations are determined by evaluating the extent to which a veteran’s service-connected disability adversely affects her ability to function under the ordinary conditions of daily life, including employment, by comparing her symptomatology with the criteria set forth in the Schedule for Rating Disabilities (Rating Schedule). 38 U.S.C. § 1155; 38 C.F.R. §§ 4.1, 4.2, 4.10.

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise the lower rating will be assigned. 38 C.F.R. § 4.7. Reasonable doubt will be resolved in the Veteran’s favor. 38 C.F.R. § 4.3. 

A veteran’s entire history is to be considered when making disability evaluations. See generally 38 C.F.R. § 4.1; Schafrath v. Derwinski, 1 Vet. App. 589 (1995). Where an increase in the level of a service-connected disability is at issue, the primary concern is the present level of disability. Francisco v. Brown, 7 Vet. App. 55 (1994). However, where the question for consideration is entitlement to a higher initial rating assigned following the grant of service connection, evaluation of the medical evidence since the effective date of the grant of service connection and consideration of the appropriateness of “staged rating” (assignment of different ratings for distinct periods of time, based on the facts found) is required. Fenderson v. West, 12 Vet. App. 119, 126 (1999).

In making its determination, the Board is obligated to weigh the credibility and probative value of lay evidence against the remaining evidence of record. See King v. Shinseki, 700 F.3d 1339 (Fed. Cir. 2012); Kahana v. Shinseki, 24 Vet. App. 428, 433-34 (2011). The credibility of lay evidence may not be refuted solely by the absence of corroborating contemporaneous medical evidence, but it is a factor. Davidson v. Shinseki, 581 F.3d 1313, 1316 (Fed. Cir. 2009). Other credibility factors are the lapse of time in recollecting events attested to, prior conflicting statements as opposed to consistency with other statements and evidence, internal consistency, facial plausibility, bias, interest, the length of time between alleged incurrence of disability and the earliest or first corroborating medical or lay evidence of the disability, and statements given during treatment (which are usually given greater probative weight, particularly if close in time to the onset of the disability). Caluza v. Brown, 7 Vet. App. 498, 511 (1995).

Although all the evidence has been reviewed, only the most relevant and salient evidence is discussed below. See Gonzales v. West, 218 F.3d 1378 (Fed. Cir. 2000) (holding that the Board must review the entire record but does not have to discuss each piece of evidence).

As noted above, the Veteran’s claim for service connection for headaches was received on April 16, 2007.

In May 2017, the Board granted service connection for headaches. That same month, the AOJ issued a rating decision effectuating the Board’s decision. The AOJ assigned an initial compensable rating under Diagnostic Code 8100, effective April 16, 2007; and a 50 percent disability rating under Diagnostic Code 8100, effective August 7, 2016.

Under Diagnostic Code 8100, a 10 percent rating is warranted for migraines with characteristic prostrating attacks averaging one in two months over the last several months. A 30 percent evaluation is warranted for migraines with characteristic prostrating attacks occurring on an average once a month over the last several months; and a 50 percent evaluation is assigned for migraines with very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability. 38 C.F.R. § 4.124a, Diagnostic Code 8100. A 50 percent rating is the maximum rating available under Diagnostic Code 8100.

The Rating Schedule does not define “prostrating.” “Prostration” has been defined as “complete physical or mental exhaustion.” MERRIAM-WEBSTER’S NEW COLLEGIATE DICTIONARY 999 (11th ed. 2007). “Prostration” has also been defined as “extreme exhaustion or powerlessness.” DORLAND’S ILLUSTRATED MEDICAL DICTIONARY 1554 (31st ed. 2007). According to Stedman’s Medical Dictionary, 27th Edition (2000), p. 1461, “prostration” is defined as “a marked loss of strength, as in exhaustion.” See Eady v. Shinseki, No. 11-3223, 2013 U.S. App. Vet. Claims LEXIS 204 ( Vet. App. Feb. 12, 2013) (The Board adopts the United States Court of Appeals for Veteran’s Claims’ (Court) definition as its own.).

Additionally, the terms “productive of severe economic adaptability” have not been clearly defined by regulations or by case law. The Court has noted that “productive of” can either have the meaning of “producing” or “capable of producing.” Pierce v. Principi, 18 Vet. App. 440, 445 (2004). Migraines need not actually “produce” severe economic inadaptability to warrant the 50 percent rating. Id. at 445-46. Further, “economic inadaptability” does not mean unemployability, as such would undermine the purpose of regulations pertaining to a total disability rating based on individual unemployability. Id. at 446; see also 38 C.F.R. § 4.16. The Board notes, however, that the migraines must be, at minimum capable of producing “severe” economic inadaptability.

Pertinent evidence of record includes the Veteran’s service treatment records, his lay statements, VA examinations dated in February 2014, August 2015, and June 2016, and VA treatment records.

A May 2007 VA treatment record noted the Veteran’s report of headaches and some lightheadedness for several years. He denied any vertigo. In a June 2007 statement, he reported experiencing headaches, feeling lightheaded off and on, and feeling faint at times. A July 2007 VA treatment record noted that the Veteran was likely experiencing muscle-tension-type headaches. A November 2007 VA treatment record noted the Veteran’s report of chronic headaches.

A July 2008 VA treatment record noted the Veteran’s complaint of chronic intermittent headaches, including tension and cloudiness. He stated that he was not taking his medication, and he denied any worsening of his headaches in both severity and frequency. He also denied any visual changes. Another July 2008 VA treatment record noted the Veteran’s report that his headaches were really intense. A November 2008 VA treatment record noted the Veteran’s report of ongoing headaches despite taking medication as directed. He denied an increased in the severity and/or frequency of his headaches.

A January 2009 VA treatment record noted the Veteran’s report of increasing headaches accompanied by lightheadedness and a panic feeling. He stated that his headaches started with pressure and a lightheaded feeling, as well as pain on the top of his head. He also reported cloudiness with his headaches. He stated that he experienced headaches twice weekly. Another January 2009 VA treatment record noted the Veteran’s report of chronic headaches since his military service. He stated that, two to three years prior, he began to have constant pressure type headaches that started on the left side of his head. He stated that his headache would occur two times a week and were accompanied by pressure-type pain and dizziness; however, he denied blurred vision, double vision, nausea, vomiting, light sensitivity, or noise sensitivity. He stated that he felt as though everything was closing in on him during an episode, and that his mind felt cloudy. He was diagnosed with tension headaches. 

A February 2009 VA treatment record noted that the Veteran was advised to stop taking his medications, except for over-the-counter medication as needed for his headaches. He stated that he was much more alert, and that his headaches were intermittent, occurring only once a week. The treated provider noted that the Veteran’s headaches appeared to be tension headaches.

In a March 2012 statement, the Veteran reported constant headaches and lightheadedness throughout the day. He stated that he wanted to be left alone in a dark room often.

An April 2013 VA examination report noted the Veteran’s report of headaches in his right frontal area that were severe and lasted for a few minutes.

In April 2014, the Veteran underwent a VA examination, and he was diagnosed with tension headaches. He reported that his headaches started in the 1990s, and he described them as a tightness around his head that started in the front and radiated to his temples and occiput. He stated that his attacks occurred five times per week, and that they lasted for five minutes at a time. He rated his headaches as ten out of ten, and he denied experiencing nausea, vomiting, photophobia, or phonophobia. He reported associated lightheadedness and dizziness without visual aura or focal deficits. He stated that he would take over-the-counter medication and that he was still able to continue working during his attacks. His headaches were worse with stress. The examiner concluded that the Veteran did not suffer from characteristic prostrating migraine attacks; that they did not impact his ability to work; and that his headaches were suggestive of nonmigraine and likely tension headaches.

In support of his claim, the Veteran submitted an August 2016 letter from Dr. M.S. who stated that, given both the frequency and severity of the Veteran’s headaches, they were classified as severe. He noted that the Veteran began to experience headaches twice a week dating back to 2009, and starting in 2014, he began to experience five headaches a week, along with lightheadedness and dizziness. Dr. M.S. noted that they had become more frequent over the last two years, and that they had consistently caused him economic loss because of the time he missed work.

In a September 2016 statement, the Veteran stated that he began to experience pressure-type headaches twice a week starting in 2005. He also stated that they had progressed to where, every morning, he would wake up with headache pain and pressure. He stated that he would also feel lightheaded and cloudy, and his thoughts were scattered. He stated that he would feel a dull, throbbing pain on the right side of his temple, along with pressure on the right side. He stated that he had a morning ritual where he would have to cry to get his head right. He stated that, sometimes, the headache would not go away, and that he would experience the dull ache, lightheadedness, and dizziness throughout the day. He stated that this is when the headaches and dizziness would get to him, that he would no longer be able to do anything, and that he would have to excuse himself from whatever activity he was doing, including work.

A May 2017 VA treatment record noted the Veteran’s report of morning headaches.

August and November 2017 private treatment records note that the Veteran denied headaches.

In an April 2018 statement, the Veteran stated that he would start his morning not knowing what kind of day his was going to have due to his headaches. He stated that he would get tension headaches that would hurt all over, but mainly on the right side, and he stated that they occurred three times a week. He stated that they started in the mid- to late-1990s, and that he would get them while he was working and would have to miss work due to the severity of his headaches. He stated that he would wake up with a headache and that they would continue throughout the day and night. He stated that he would still go to work when he had a headache because he had to provide for his family.

In a separate statement, the Veteran’s wife stated that he experienced severe headaches for as long as she has known him, especially in the morning. She stated that he would take over-the-counter medication for his headaches, but because he was old fashioned, he would not allow his headaches from preventing from working. She recalled times when he called her saying that he should not have gone to work due to his headache, and that there were times when his supervisors would send him home for his headaches. She stated that when he would get headaches, there was nothing he could do, and they would have to cancel plans because he would have to lie down for the whole day.

In support of his claim, the Veteran submitted an April 2018 private medication from Dr. M.C. who discussed his pertinent medical treatment records, as well as his reports of intractable headaches since service. The Veteran reported that they occurred one or twice a week, and that he was able to tolerate them, and that he was able to function, including at work, despite their severity. He stated that his headaches became progressively more severe until 2014 when they started to occur on a daily basis. He again reported waking up with severe headaches that started on his right side and caused pain through the entirety of his head. He stated that he was originally able to treat his headaches with over-the-counter medication, but that it soon became ineffective and he given prescription medications. He stated that his headaches would linger for hours and would require him to lay down in a quiet room allowing them to dissipate. The Veteran described the rated the pain associated with his headaches as ten out of ten, and he stated that he would miss fifteen out of thirty work days due to the severity of his headaches. Dr. M.C. concluded that his daily headaches caused an extraordinary disability. Dr. M.C. stated that the Veteran’s headaches were prostrating, requiring him to remove himself to a quiet room and lay down in order for the headaches to be mitigated. Dr. M.C. also noted that there were times when the Veteran would suffer from an intractable headache while sitting at home, and that he was incapable of going to work or engaging in any activities. Dr. M.C. concluded that the Veteran’s service-connected headaches caused severe economic difficulties, as they were intense, frequent, and intractable without any clinical resolution despite multiple consultations with different specialists.

Based on the evidence of record, the Board finds that the preponderance of the evidence is against the Veteran’s claim for a compensable rating for his service-connected headaches prior to August 7, 2016.

Significantly, although the evidence of record demonstrates that the Veteran experienced multiple headaches per week prior to August 7, 2016, the credible evidence of record fails to demonstrate that such were characteristic prostrating. For example, while the Veteran’s treatment records dated prior to August 7, 2016, reflect his ongoing complaints of headaches accompanied by lightheadedness, dizziness, and cloudiness multiple times per week, the Veteran’s reports do not indicate that his headaches were characteristically prostrating. Furthermore, the April 2014 VA examiner noted the Veteran’s reported symptoms, including pain, lightheadedness, and dizziness; however, the examiner concluded that his headaches were not characteristically prostrating. In support of this conclusion, the examiner specifically noted the Veteran’s report that his headaches last only five minutes at a time, and that he was able to work through his attacks. The Veteran’s report that his headaches lasted for only a short time is further supported by his statements during the April 2013 VA examination, wherein he reported that his severe headaches would last for a few minutes.

As for the lay statements of record from both the Veteran and his wife, the Board finds that such are not credible. As noted above, in weighing credibility, VA may consider, among other things, inconsistent statements and consistency with other evidence of record. See Caluza, 7 Vet. App. at 511. While he is competent to report the frequency of his headaches, and his reports of headaches multiple times per week have been consistent throughout the appeal period, his descriptions concerning the severity and the functional impairment have been inconsistent. For example, although the Veteran reported in March 2012 that his headaches required him to be left alone in a dark room often, during the April 2013 VA examination, he stated that his headaches lasted only a few minutes. Likewise, during the April 2014 VA examination, he stated that his headaches only lasted five minutes at a time, and that he was still able to work despite his headaches. Finally, despite receiving treatment throughout the period from April 2007 to August 2016, and consistently reporting headaches to his treatment providers, the Veteran never indicated that he experienced prostrating attacks; indeed, he and his wife have only described prostrating attacks in his statements made in connection with his claim for monetary benefits, including his statements made to both Dr. M.S. and Dr. M.C. While the lack of complaints to his treatment providers is not dispositive as to the Veteran’s credibility, combined with the inconsistent statements above, the Board finds that such weighs against the credibility of the lay statements of record.

Furthermore, insofar as Drs. M.S. and M.C. both indicated that the Veteran’s service-connected headaches more closely approximated the criteria for a 50 percent disability rating since 2007, the Board finds that the evidence discussed above is more probative as to the nature and severity of the Veteran’s service-connected headaches given that it was more contemporaneous to the time period at issue. Furthermore, both Drs. M.S. and M.C. largely based their opinions on the Veteran’s lay statements, which the Board has found to be not credible. 

In sum, the Board finds that the preponderance of the evidence is against the Veteran’s claim for an initial compensable rating for his service-connected headaches at any point prior to August 7, 2016. Therefore, the benefit-of-the-doubt doctrine is not applicable, and his claim must be denied. See 38 U.S.C. § 5107; 38 C.F.R. §§ 3.102, 4.3; Gilbert v. Derwinski, 1 Vet. App. 49, 55-57 (1990).

As for the period from August 7, 2016, as noted above, a 50 percent disability rating is the maximum schedular rating available under Diagnostic Code 8100. There are no other diagnostic codes that are applicable for rating the Veteran’s service-connected headaches. A schedular rating in excess of 50 percent is not warranted as a matter of law. Sabonis v. Brown, 6 Vet. App. 426, 430 (1994).

IV. Effective Dates and Increased Ratings for Service-Connected Right Elbow Disability

A. Increased Rating

As noted above, disability evaluations are determined by evaluating the extent to which a veteran’s service-connected disability adversely affects her ability to function under the ordinary conditions of daily life, including employment, by comparing his symptomatology with the criteria set forth in the Rating Schedule. 38 U.S.C. § 1155; 38 C.F.R. §§ 4.1, 4.2, 4.10.

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise the lower rating will be assigned. 38 C.F.R. § 4.7. Reasonable doubt will be resolved in the Veteran’s favor. 38 C.F.R. § 4.3. 

A veteran’s entire history is to be considered when making disability evaluations. See generally 38 C.F.R. § 4.1; Schafrath v. Derwinski, 1 Vet. App. 589 (1995). Where an increase in the level of a service-connected disability is at issue, the primary concern is the present level of disability. Francisco v. Brown, 7 Vet. App. 55 (1994). Staged ratings are appropriate for an increased rating claim when the factual findings show distinct time periods where the service-connected disability exhibits symptoms that would warrant different ratings. Hart v. Mansfield, 21 Vet. App. 505 (2007).

For purposes of the Rating Schedule, major joints are considered to be the shoulder, elbow, wrist, hip, knee, and ankle. Multiple involvements of the interphalangeal, metacarpal and carpal joints of the upper extremities; the interphalangeal, metatarsal and tarsal joints of the lower extremities; the cervical vertebrae; the dorsal vertebrae; and the lumbar vertebrae, are considered groups of minor joints, ratable on a parity with major joints. See 38 C.F.R. § 4.45.

Disability of the musculoskeletal system is primarily the inability, due to damage or infection in parts of the system, to perform the normal working movements of the body with normal excursion, strength, speed, coordination and endurance. Functional loss may be due to the absence or deformity of structures or other pathology, or it may be due to pain, supported by adequate pathology and evidenced by the visible behavior in undertaking the motion. Weakness is as important as limitation of motion, and a part that becomes painful on use must be regarded as seriously disabled. 38 C.F.R. § 4.40. In Mitchell v. Shinseki, 25 Vet. App. 32 (2011), the Court held that, although pain may cause a functional loss, “pain itself does not rise to the level of functional loss as contemplated by VA regulations applicable to the musculoskeletal system.” Rather, pain may result in functional loss, but only if it limits the ability “to perform the normal working movements of the body with normal excursion, strength, speed, coordination, or endurance.” 38 C.F.R. § 4.40.

With respect to joints, in particular, the factors of disability reside in reductions of normal excursion of movements in different planes. Inquiry will be directed to more or less than normal movement, weakened movement, excess fatigability, incoordination, pain on movement, swelling, deformity or atrophy of disuse. 38 C.F.R. § 4.45.

The intent of the Rating Schedule is to recognize actually painful, unstable or malaligned joints, due to healed injury, as entitled to at least the minimum compensable rating for the joint. 38 C.F.R. § 4.59. In Burton v. Shinseki, 25 Vet. App. 1, 5 (2011), the Court found that, when 38 C.F.R. § 4.59 is raised by the claimant or reasonably raised by the record, even in non-arthritis contexts, the Board should address its applicability.

Under Diagnostic Code 5206, a 10 percent disability rating is warranted for limitation of flexion of either the major or minor forearm to 100 degrees; a 20 percent disability rating is warranted for limitation of flexion of either the major or minor forearm to 90 degrees; limitation of flexion of the major and minor forearm to 70 degrees warrants 30 and 20 percent ratings, respectively; limitation of flexion of the major and minor forearm to 55 degrees warrants 40 and 30 percent ratings, respectively; and limitation of flexion of the major and minor forearm to 45 degrees warrants 50 and 40 percent ratings, respectively. 38 C.F.R. § 4.71a.

Under Diagnostic Code 5207, a 10 percent disability rating is warranted when extension is limited to either 45 or 60 degrees for both the major and minor elbow; a 20 percent disability rating is warranted when extension is limited to 75 degrees for both the major and minor elbow; a 20 percent disability rating is warranted when extension is limited to 90 degrees for the minor elbow; a 30 percent disability rating is warranted when extension is limited to 90 degrees for the major elbow; a 30 percent disability rating is warranted when extension is limited to 100 degrees for the minor elbow; a 40 percent disability rating is warranted when extension is limited to 100 degrees for the major elbow; a 40 percent disability rating is warranted when extension is limited to 110 degrees for the minor elbow; and a 50 percent disability rating is warranted when extension is limited to 110 degrees for the major elbow. Id.

Under Diagnostic Code 5213, a 10 percent disability rating is warranted for limitation of supination to 30 degrees or less for the major or minor arm. A 20 percent rating is warranted both the major and minor arms for limitation of pronation with motion lost beyond last quarter of arc, where the hand does not approach full pronation. For limitation of pronation with motion lost beyond middle of arc, a 30 percent rating is warranted for the major arm and a 20 percent rating is warranted for the minor arm. Id.

The Veteran’s claim for an increased rating for his service-connected right elbow disability was received on June 23, 2016. The right arm is his dominant (major) arm.

In a July 2016 rating decision, the AOJ awarded 10 percent disability rating to the Veteran’s service-connected right elbow disability under Diagnostic Code 5003-5207 based on the presence of painful motion, effective September 18, 2015. The AOJ also awarded a separate 10 percent disability rating under Diagnostic Code 5213 based on the presence of painful motion, effective September 18, 2015.

A May 2015 private treatment record noted that the Veteran’s health issues current included a strain of the right elbow and forearm. No examination results were documented.

A January 2016 VA treatment record noted that X-rays of the right elbow revealed osteophytosis of the olecranon process. The rest of the elbow joint was preserved, with no evidence of elevated fat pads, joint effusion, or hemarthrosis. There were no fractures or lesions, the soft tissues were present, and there was adequate alignment.

In July 2016, the Veteran underwent a VA examination and was diagnosed with medial epicondylitis, degenerative arthritis, and olecranon spur. The Veteran reported flare-ups in his right elbow, manifested as pain. He also stated that his pain made it difficult to ride his motorcycle. Range of motion testing revealed flexion to 145 degrees; extension to zero degrees, forearm supination to 85 degrees, and forearm pronation to 80 degrees. Pain was noted on extension, supination, and pronation. There was evidence of pain with weight bearing. There was evidence of pain at the epicondyle area of the elbow on palpation. The Veteran was able to perform repetitive use testing, and there was no additional functional loss or a decreased in range of motion. The examiner also noted that pain, weakness, fatigability, or incoordination did not significantly limit the Veteran’s functional ability with repeated use. The examiner also stated that the examination was medically consistent with his lay statements describing his functional loss during flare-ups, and that pain, weakness, fatigability, or incoordination did not significantly limit the Veteran’s functional ability during flare-ups. Muscle strength testing was normal, and there was no evidence of atrophy. The examiner noted that the Veteran did not have flail joint, joint fracture, ununited fracture, malaligned fracture, or impairment of supination or pronation. He required the occasional use of a brace for stability. As for the effect that the Veteran’s service-connected right elbow had on his ability to perform occupational tasks, the examiner noted that he experienced pain in his right elbow and would have to favor his left arm more frequently.

Based on the evidence of record, the Board finds that the Veteran is not entitled to ratings in excess of the currently-assigned 10 percent ratings under Diagnostic Codes 5003-5207 and 5213 for his service-connected right elbow disability at any point from September 18, 2015.

Initially, the Board notes that higher ratings could be assigned under Diagnostic Code 5205 for ankylosis of the elbow; however, there is no evidence of record demonstrating ankylosis in the Veteran’s right elbow warranting a rating under Diagnostic Code 5205. Ankylosis is defined as immobility and consolidation of a joint due to disease, injury, or surgical procedure. See Dorland’s Illustrated Medical Dictionary 94 (32th ed. 2012); see also 38 C.F.R. § 4.71a, General Rating Formula for Diseases and Injuries of the Spine, Note (5) (defining ankylosis as fixation of a joint in a particular position). During the July 2016 VA examination, the examiner indicated that the Veteran displayed full range of motion, and there was no indication that ankylosis was present. 

Furthermore, as for Diagnostic Codes 5206, 5207, and 5213, concerning limitation of flexion, extension, and supination/pronation, the Board notes that the Veteran’s range of motion during the July 2016 VA examination did not meet the criteria for compensable ratings under those diagnostic codes, let alone the criteria warranted for higher ratings. Rather, as noted by the July 2016 rating decision, the separately-assigned 10 percent disability ratings under Diagnostic Codes 5207 and 5213 for his service-connected right elbow disability were based on the July 2016 VA examination report which found evidence of painful motion on both extension and supination/pronation.

The Board also notes that, although the Veteran reported flare-ups during his July 2016 VA examination, the examiner indicated that the examination findings were consistent the Veteran reports of functional impairment during flare-ups, and that pain, weakness, fatigability, or incoordination did not significantly limit his functional ability during flare-ups.

In sum, the Board finds that the preponderance of the evidence fails to support ratings in excess of the currently-assigned 10 percent ratings under Diagnostic Codes 5003-5207 and 5213 for the Veteran’s service-connected right elbow disability under any applicable diagnostic code from September 18, 2015. Because the preponderance of the evidence is against higher ratings, the benefit-of-the-doubt doctrine is not applicable. See 38 U.S.C. § 5107(b); 38 C.F.R. §§ 3.102, 4.3; Gilbert, 1 Vet. App. at 55-57.

B. Effective Dates

The assignment of effective dates of awards is generally governed by 38 U.S.C. § 5110 and 38 C.F.R. § 3.400. Unless specifically provided otherwise, the effective date of an award based on a claim for service connection or for an increase of compensation “shall be fixed in accordance with the facts found, but shall not be earlier than the date of receipt of application therefor.” 38 U.S.C. § 5110(a). The implementing regulation clarifies this to mean that the effective date of an award of service connection or for increased compensation “will be the date of receipt of the claim or the date entitlement arose, whichever is later.” 38 C.F.R. § 3.400. 

This claim is subject to the more specific criteria under 38 U.S.C. § 5110(b)(2) and 38 C.F.R. § 3.400(o)(2). “The effective date of an award of increased compensation shall be the earliest date as of which it is ascertainable that an increase in disability had occurred, if application is received within one year from such date.” 38 U.S.C. § 5110(b)(2). The implementing regulation summarizes the criteria for an effective date of an award of increased compensation as the “[e]arliest date as of which it is factually ascertainable that an increase in disability had occurred if claim is received within 1 year from such date otherwise, date of receipt of claim.” 38 C.F.R. § 3.400(o)(2). 

The Court has indicated that it is axiomatic that the fact that must be found, in order for entitlement to an increase in disability compensation to arise, that the service-connected disability must have increased in severity to a degree warranting an increase in compensation. See Hazan v. Gober, 10 Vet. App. 511, 519 (1992) (noting that, under section 5110(b)(2), which provides that the effective date of an award of increased compensation shall be the earliest date of which it is ascertainable that an increase in disability had occurred, “the only cognizable ‘increase’ for this purpose is one to the next disability level” provided by law for the particular disability). Determining whether an effective date assigned for an increased rating is correct or proper under the law requires (1) a determination of the date of the receipt of the claim for the increased rating as well as (2) a review of all the evidence of record to determine when an increase in disability was “ascertainable.” Id. at 521. 

Effective March 24, 2015, VA amended its adjudication regulations to require that all claims governed by VA’s adjudication regulations be filed on standard forms prescribed by the Secretary. See 79 Fed. Reg. 57,660 (Sept. 25, 2014). This rulemaking also eliminated the constructive receipt of VA reports of hospitalization or examination and other medical records as informal claims for increase, and revised 38 C.F.R. § 3.400(o)(2).

Under the former regulations, any communication indicating intent to apply for a benefit under the laws administered by the VA may be considered an informal claim provided it identifies, but not necessarily with specificity, the benefit sought. See 38 C.F.R. § 3.155(a) (2014). To determine when a claim was received, the Board must review all communications in the claims file that may be construed as an application or claim. See Quarles, 3 Vet. App. at 134.

Under former 38 C.F.R. § 3.157(a) (which was in effect prior to March 24, 2015), a report of examination or hospitalization would be accepted as an informal claim for increase or to reopen, if the report relates to a disability that may establish entitlement. However, there must first be a prior allowance or disallowance of a claim. See 38 C.F.R. § 3.157(b) (2014).

In Servello v. Derwinski, 3 Vet. App. 196, 198 (1992), the Court held that the applicable statutory and regulatory provisions, fairly construed, require the Board to look at all communications in the file that might be interpreted as applications or claims, formal or informal, for increased benefits and, then, to all other evidence of record to determine the “earliest date as of which,” within the one-year prior to the claim, the increase in disability was ascertainable. 38 U.S.C. § 5110(b)(2); 38 C.F.R. §§ 3.400(o)(2), 3.155(a); Quarles, 3 Vet. App. at 134.

By way of background, in a September 2009 rating decision, the AOJ granted service connection for a right elbow disability and assigned a noncompensable disability rating under Diagnostic Code 5024-5206. The Veteran underwent another VA examination in April 2010 and, in May 2010, he requested an increased disability rating for his service-connected right elbow disability. In a June 2010 rating decision, the AOJ continued the noncompensable rating assigned to the Veteran’s service-connected right elbow disability. Although notified of the decision, he did not initiate a timely appeal of the June 2010 rating decision.

The Board has considered the applicability of 38 C.F.R. § 3.156(b), which provides that, when new and material evidence is received prior to the expiration of the appeal period, it will be considered as having been filed in connection with the claim which was pending at the beginning of the appeal period. However, no additional evidence was received prior to the expiration of the appeal periods stemming from the June 2010 rating decision. See also Bond v. Shinseki, 659 F.3d 1362, 1367 (Fed. Cir. 2011). 

As such, the June 2010 rating decision is final. 38 U.S.C. § 7105 (2002); 38 C.F.R. § 3.104, 20.302, 20.1103 (2009).

The Board acknowledges that finality in the June 2010 rating decision could be vitiated by a finding of clear and unmistakable error (CUE). See Routen v. West, 142 F.3d 1434 (Fed. Cir. 1998) (listing CUE as one of the three exceptions to the rules regarding finality and effective dates). However, no such claim has been raised here. A CUE claim requires some degree of specificity not only as to what the alleged error is, but—unless it is the kind of error that, if true, would constitute CUE on its face—persuasive reasons must be given as to why the result would have been manifestly different but for the alleged error. See Phillips v. Brown, 10 Vet. App. 25, 31 (1997). 

Following the final June 2010 rating decision, the Veteran’s claim for increased rating was received on June 23, 2016. In the July 2016 rating decision, the AOJ accepted a September 18, 2015, claim as an intent to file a claim for an increased rating for the Veteran’s service-connected right elbow disability. With this in mind, the Board has considered whether any communication or report of examination or hospitalization dated prior to September 18, 2015, may be considered an informal claim; however, prior to September 18, 2015, he did not submit any document that referenced his service-connected right elbow disability, and no report of examination or hospitalization referenced his service-connected right elbow disability. Accordingly, the date of the Veteran’s increased rating claim is September 18, 2015.

As noted above, in a July 2016 rating decision, the AOJ awarded 10 percent disability rating to the Veteran’s service-connected right elbow disability under Diagnostic Code 5003-5207 based on the presence of painful motion, effective September 18, 2015. The AOJ also awarded a separate 10 percent disability rating under Diagnostic Code 5213 based on the presence of painful motion, effective September 18, 2015.

The Board has reviewed the evidence of record within the one-year period prior to the receipt of the Veteran’s claim on September 18, 2015, to determine whether it is factually ascertainable that his service-connected right elbow disability increased in severity during that time period to warrant an earlier effective date for the award within that year. The only evidence dated during the one-year period prior to September 18, 2015, is the Veteran’s May 2015 private treatment record which noted that the Veteran’s health issues current included a strain of the right elbow and forearm; however, no examination results were documented that address the nature and severity of the Veteran’s right elbow disability. Thus, it was not factually ascertainable that his service-connected right elbow disability increased in severity within a year prior to September 18, 2015, warranting an earlier effective date for the separate 10 percent disability ratings 38 C.F.R. § 3.400(o)(2). 

In the absence of a pending formal or informal claim for increase that has been left unadjudicated by VA in a prior final decision, the Board is constrained by the laws and regulations governing the assignment of effective dates from awarding the Veteran an effective date earlier than September 18, 2015, for the assignment of separate 10 percent disability ratings for the Veteran’s service-connected right elbow disability. The benefit sought on appeal is denied.

REASONS FOR REMAND

The remaining issues on appeal are remanded to correct duty to assist errors that occurred prior to when the Veteran submitted his RAMP election form on May 1, 2018.

1. Entitlement to service connection for OSA

The Veteran claims entitlement to service connection for OSA, to include as secondary to his service-connected PTSD.

In April 2018, the Veteran submitted a private medical opinion from Dr. M.C., who opined that his OSA was at least as likely as not causally related to his service-connected PTSD. Although Dr. M.C. discussed the findings of two medical articles that an increased correlation between veterans with PTSD and the development of OSA, he did not provide any supporting rationale as to how the Veteran’s OSA was caused or aggravated by his service-connected PTSD.

To date, the Veteran has not been afforded a VA examination to determine whether his OSA is secondary to his service-connected PTSD. Given that Dr. M.C.’s opinion was of record at the time the Veteran’s May 2018 RAMP opt-in election form was received, the Board finds that the AOJ committed a pre-decisional duty to assist error by failing to schedule him for a VA examination. As such, a remand is necessary.

2. Entitlement to service connection for lymphoma, to include as due to chemical exposures in Southwest Asia, is remanded.

The Veteran claims entitlement to service connection for lymphoma as a result of various hazardous exposures, including exposures while serving in Southwest Asia, exposure to asbestos while serving aboard the U.S.S. John A. Moore, and exposure to jet fuel. See, e.g., October 2016 VA Form 21-4138, Statement in Support of Claim.

A December 2015 private treatment record noted that the Veteran’s was recently diagnosed with Hodgkin’s lymphoma, that he was a Gulf War Veteran and was exposed to chemical agents, and that there was a high risk of lymphoma in patient’s exposed to chemical agents.

In a January 2016 letter the Veteran’s VA treatment provider noted that he had recently been diagnosed with mixed cellularity classical Hodgkin’s lymphoma, and that he had served in Southwest Asia. Although the VA treatment provider noted that there was a very high risk of lymphoma in patients who were exposed to chemical agents during warfare, he did not provide a clear opinion with a supporting rationale as to whether the Veteran’s lymphoma was related to his service in Southwest Asia.

In May 2016, the Veteran underwent a VA examination which address the current nature and severity of his lymphoma; however, no opined was requested as to whether such was related to the Veteran’s military service.

In May 2016, the Veteran also submitted a number of internet articles that address the increased risk of lymphoma in veterans who served in Southwest Asia.

To date, the Veteran has not been afforded a VA examination to determine whether his lymphoma is related to his military service. Given that the evidence of record at the time the Veteran’s May 2018 RAMP opt-in election form was received included evidence of a current diagnosis, the December 2015 private treatment record, the January 2016 letter from the Veteran’s VA treatment provider, and the articles submitted in May 2016, the Board finds that the AOJ committed a pre-decisional duty to assist error by failing to schedule him for a VA examination. As such, a remand is necessary.

3. Entitlement to an initial rating in excess of 30 percent prior to June 13, 2016, and in excess of 70 percent thereafter, for service-connected PTSD; and entitlement to a temporary total percent evaluation under 38 C.F.R. § 4.29 are remanded.

Unfortunately, the Board finds that a remand is necessary to obtain outstanding treatment records that were identified by the Veteran prior to when his May 1, 2018, RAMP opt-in election form was received.

In September 2015, the Veteran filed a claim for a temporary total percent evaluation under 38 C.F.R. § 4.29. In support of that claim, the Veteran submitted a photograph of his wristband identifying the place of treatment as the emergency room at the William Beaumont Army Medical Center. Also submitted were after-care instructions from the William Beaumont Army Medical Center related to a recently-diagnosed anxiety attack.

Despite the fact that the Veteran’s submission indicated that he received psychiatric treatment from the William Beaumont Army Medical Center in September 2015, the latest records associated with the claims from this facility are dated through May 4, 2012, and there is no indication that the AOJ has requested that the Veteran provide the necessary authorization or that it has attempted to obtain these records.

Thus, he should be provided the opportunity to submit or identify any additional treatment records that are relevant to his claims, to include any pertinent treatment from William Beaumont Army Medical Center in September 2015, and to provide the necessary information in order for the VA to assist him in obtaining these potentially relevant records. See 84 Fed. Reg. 138, 169-179 (Jan. 18, 2019) (to be codified at 38 C.F.R. § 3.159(c).

4. Entitlement to a TDIU due to service-connected disabilities is remanded.

Finally, because a decision on the issues being remanded could significantly impact a decision on the issue of entitlement to a TDIU, the issues are inextricably intertwined. Thus, a remand of the claim of entitlement to a TDIU is required.

The matters are REMANDED for the following action:

1. Give the Veteran an additional opportunity to submit or identify any outstanding pertinent evidence that has not already been associated with the claims file, to include any treatment records from the William Beaumont Army Medical Center in September 2015. The AOJ should then attempt to obtain those records if he provides the appropriate authorization.

2. Schedule the Veteran for a VA examination to determine whether his OSA is related to his military service, or whether such is secondary to his service-connected PTSD. The record and a copy of this Remand must be made available to the examiner. Any indicated evaluations, studies, and tests should be conducted. The examiner should take a history from the Veteran as to the progression of his claimed disability. 

Following a review of the entire record, to include the Veteran’s lay statements concerning onset and continuity of symptomatology, the examiner(s) should address the following questions:

a) Is it at least as likely as not (i.e., a 50 percent or greater probability) that the Veteran’s OSA had its onset in, or is otherwise related to his active duty service?

In offering any opinion, the examiner must consider the full record, to include the Veteran’s lay statements regarding in-service incurrence and continuity of symptomatology, and the opinion should reflect such consideration.

b) Regardless of the answers provided to the question above, is it at least as likely as not (i.e., a 50 percent or greater probability) that the Veteran’s OSA was caused or aggravated beyond its natural progression by his service-connected PTSD? In this regard, the Board emphasizes that causation and aggravation are two separate inquiries, and both must be answered.

The examiner should address the significance, if any, of Dr. M.C. April 2018 opinion, including the medical articles discussed which not an increased risk in the development of OSA in veterans with PTSD.

A complete rationale must be provided for all opinions, and must be based on consideration of all pertinent lay and medical evidence.

3. Schedule the Veteran for a VA examination to determine whether his lymphoma is related to his military service. The record and a copy of this Remand must be made available to the examiner. Any indicated evaluations, studies, and tests should be conducted. The examiner should take a history from the Veteran as to the progression of his claimed disability. 

Following a review of the entire record, to include the Veteran’s lay statements concerning onset and continuity of symptomatology, the examiner(s) should address the following question:

Is it at least as likely as not (i.e., a 50 percent or greater probability) that the Veteran’s lymphoma had its onset in, or is otherwise related to his active duty service, to include his alleged exposures while serving in Southwest Asia, his alleged exposure to asbestos while serving aboard the U.S.S. John A. Moore, and/or his alleged exposure to jet fuel?

In offering any opinion, the examiner must consider the full record, to include the Veteran’s lay statements regarding in-service incurrence and continuity of symptomatology, and the opinion should reflect such consideration. Furthermore, the examiner should address the significance, if any, of the articles submitted by the Veteran in May 2016 which discuss the relationship between lymphoma and service in Southwest Asia. Finally, the examiner should address the December 2015 private treatment record and the January 2016 letter from the Veteran’s VA treatment provider which indicate a relationship between service in Southwest Asia and the development of lymphoma.

A complete rationale must be provided for all opinions and must be based on consideration of all pertinent lay and medical evidence.

 

 

Emily Tamlyn

Acting Veterans Law Judge

Board of Veterans’ Appeals

Attorney for the Board James R. Springer, Associate Counsel

The Board’s decision in this case is binding only with respect to the instant matter decided. This decision is not precedential, and does not establish VA policies or interpretations of general applicability. 38 C.F.R. § 20.1303.